IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 7, 2004 Session

## SHERRY HUNTER, ADMINISTRATRIX OF THE ESTATE OF LAWRENCE HUNTER, DECEASED v. JAY MICHAEL URA, M.D., ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Davidson County**
**No. 96C-3784    Marietta M. Shipley, Judge**

---

**No. M2002-02573-SC-R11-CV - Filed March 29, 2005**

---

We granted this appeal to determine whether the trial court committed reversible error in granting the plaintiff eight peremptory challenges during jury selection, whether the trial court properly denied a motion for a mistrial after the plaintiff cross-examined a defense expert witness with a prior statement, whether the trial court properly allowed the plaintiff to cross-examine a defense expert with an alleged learned treatise, and whether the trial court properly excluded the deposition of a defense expert witness. The Court of Appeals held that the trial court committed reversible error on these four issues, reversed the jury's verdict in favor of the plaintiff, and remanded for a new trial. The intermediate court chose not to review numerous remaining issues raised by the parties.

After carefully reviewing the record and authority, we conclude:  1) that the trial court erred in granting the plaintiff eight peremptory challenges but the error did not affect the outcome or prejudice the administration of justice, 2) that the trial court did not abuse its discretion in denying a motion for a mistrial after the plaintiff had cross-examined an expert witness with a prior statement, 3) that the trial court did not err in allowing the plaintiff to cross-examine a defense expert witness with an alleged learned treatise, and 4) that the trial court did not abuse its discretion in excluding the deposition testimony of a defense expert witness.  In addition, after reviewing the remaining issues, including those that were pretermitted by the Court of Appeals, we hold:  1) that the trial court erred in remitting the jury's verdict by $1,500,000, 2) that the trial court did not abuse its discretion by denying prejudgment interest to the plaintiff, 3) that awarding damages for the loss of consortium did not violate the defendants' rights under the United States or Tennessee constitutions, 4) that the trial court did not err in finding that the plaintiff's expert witness established the professional standard of care in the community in which the defendants practiced and in denying the defendants' motion for directed verdict on this basis, 5) that the trial court did not err in allowing the plaintiff to introduce hearsay statements from medical literature or make arguments as to the presence or absence of medical literature, 6) that the trial court did not err in denying a motion for a mistrial or a continuance based on the unavailability of a defense expert witness, and 7) that the trial court did not err in refusing to allow the defendants a credit against the jury's verdict based on a payment received by the plaintiff under the decedent's executive insurance plan.  Accordingly, we reverse the Court of Appeals' judgment and reinstate the jury's verdict in favor of the plaintiff.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Reversed; Jury Verdict Reinstated**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which JANICE M. HOLDER, J., and
ALLEN W. WALLACE, SP.J., joined. WILLIAM M. BARKER, J., filed a concurring and dissenting
opinion, in which FRANK F. DROWOTA, III, C.J., joined.

Gary K. Smith and C. Phillip M. Campbell, Memphis, Tennessee, for the Appellant, Sherry Hunter.

E. Reynolds Davies, Jr., Ed R. Davies, and Daniel D. Warlick, Nashville, Tennessee, for the
Appellees, Jay Michael Ura, M.D., and Nashville Anesthesia Services.

**OPINION**

**BACKGROUND**

In October of 1996, Sherry Hunter ("plaintiff") filed a complaint against Dr. Jay Michael Ura
and Nashville Anesthesia Service ("defendants"), seeking $15,000,000 for the wrongful death of her
husband, Lawrence Hunter. The complaint was later amended to add loss of consortium claims for
the plaintiff and her two minor children. The evidence is briefly summarized below.

On October 27, 1995, Lawrence Hunter underwent shoulder surgery to repair his right rotator
cuff at the Columbia Southern Hills Medical Center in Nashville, Tennessee. Hunter was given a
general anesthesia by Dr. Jay Michael Ura, and the surgery was performed by Dr. Jack Renfro.
Hunter could not be awakened following the surgery, and he died on November 1, 1995. He was
forty-nine years of age.

The plaintiff alleged that her husband (hereinafter "the decedent") died as a result of cerebral
hypoxia, i.e., insufficient oxygen to his brain, during the surgery and that his death was a direct and
proximate result of Dr. Ura's failure to comply with the standard of care applicable to an
anesthesiologist.

At trial, Sherry Hunter testified that the decedent had worked as an electrical engineer for
Nissan. She described their marriage and their family relationship with their two sons, Ben and Joey.
Ben Hunter also testified about his relationship with his father.

Michael L. Brookshire, Ph.D., a professor of economics at Marshall University, testified
about the decedent's work history, position with Nissan, income, family contributions, and earning
capacity. Dr. Brookshire testified that the decedent's lost net earning capacity was $5,200,000 when
calculated with his life expectancy of seventy-seven years. He further testified that the decedent's
lost net earning capacity was $2,755,125 when based on his work-life expectancy of 63.4 years.

Dr. William T. Witt, M.D., a board-certified anesthesiologist, testified that he reviewed the medical records and depositions pertaining to the surgery, treatment, and autopsy of the decedent. He concluded that the decedent's death was the result of inadequate blood supply to his brain during the surgery and that the death was the direct and foreseeable result of Dr. Ura's failure to comply with the standard of care applicable to an anesthesiologist in Nashville, Tennessee.

Dr. Witt explained that the decedent had been operated on in a "semi-recumbent" position and that a patient is "very susceptible to this type of injury any time the head is elevated above the heart." Dr. Witt testified that it is "absolutely critical" to consider the effect of gravity to make sure that a patient's brain is receiving an adequate blood supply and that "perfusion of the brain is probably the most fundamental thing an anesthesiologist is responsible for."

Dr. Witt described a basic formula for using a patient's mean arterial pressure, as taken by a blood pressure cuff at heart level, to measure cerebral perfusion pressure as adjusted for gravity during the surgery. Stated simply, an anesthesiologist estimates the distance in inches of the patient's head above the heart, multiplies that number by two, and subtracts that total from the mean arterial pressure measured at the patient's heart.[1] Dr. Witt said that a patient's normal inter-cranial pressure is also subtracted from the mean arterial pressure.

According to Dr. Witt, the medical records revealed that Dr. Ura relied upon the decedent's mean arterial pressure taken at the level of the heart and did not make these conversions to adjust for gravity. Moreover, Dr. Witt testified that when adjusted for the effect of gravity, the cerebral perfusion pressure dropped to levels that were "not close to acceptable" on numerous occasions and constituted "a dramatic deviation from the standard of care." Dr. Witt emphasized that Dr. Ura failed to take any corrective action, such as decreasing the level of anesthesia, adding fluids, compressing the patient's lower body, or lowering the patient's head.

Dr. Michael Gregory Balko, a pathologist and professor of forensic pathology at the University of Cincinnati, testified that he examined the decedent's brain after the autopsy. He determined that there had been an insufficient supply of blood to the brain, i.e., an "acute hypoxic event." Dr. Balko testified that there was no developmental abnormality in the decedent's brain and that the two internal carotid arteries and two vertebral arteries leading to the "Circle of Willis" at the base of his brain were normal and intact.[2]

Dr. Steven Obermier, an anesthesiologist, testified by videotaped deposition that he administered an interscalene block to the decedent's right shoulder before the surgery. Although he had "no idea" as to the cause of death, Dr. Obermier testified that a loss of cerebral perfusion

---

[1] Dr. Witt said that the distance is multiplied by two to convert the pressure to millimeters of mercury.

[2] Dr. Witt had explained that the Circle of Willis is located at the base of an individual's brain and is a mechanism governing "auto-regulation," or the process of balancing blood flow to the brain. Dr. Witt had also testified that the autopsy records revealed that the decedent's vital organs were normal and that the decedent's two carotid arteries and vertebral arteries leading to the Circle of Willis at the base of the brain were normal.

-3-

pressure could explain the outcome. Dr. Obermier stated that whether there is a difference of blood pressure at heart level (as measured by a blood pressure cuff on the upper arm) and in the brain "depends on the position of the patient." Although Dr. Obermier was not familiar with the specific formula, he stated that a patient's mean arterial pressure at the heart could be converted to measure cerebral perfusion pressure. He believed one would need to know the pressure at the arm, the internal jugular vein, the cerebral spinal fluid, and the brain. Dr. Obermier testified that he had no opinion as to whether Dr. Ura's acts or omissions caused Lawrence Hunter's death.

Dr. Hugh Head, an anesthesiologist, testified by videotaped deposition that he consulted with Dr. Ura when the decedent could not be awakened after the surgery. Dr. Head ruled out the interscalene block but was "not sure what happened" to cause the death. He testified that the mean arterial pressure must be kept high enough to perfuse the brain when a patient's head is above the heart during surgery. Dr. Head stated that although the blood pressure cuff on a patient's upper arm does not measure a patient's mean arterial pressure in the brain, an adequate mean arterial pressure at the cuff "will perfuse the brain." Dr. Head testified that cerebral perfusion pressure is not measured during a surgery, and he believed that measuring cerebral perfusion pressure would require placing an interior monitoring line in the brain.

Finally, Dr. Roy James Renfro, an orthopedic surgeon, testified by videotaped deposition that he performed the surgery while the decedent was in a positioning device at a forty-five degree angle. Dr. Renfro thought that the surgery went well, and he had no explanation for the death. Testing revealed that the decedent's electrolytes, blood gases, oxygen, and EKG had been normal and showed nothing unusual. The autopsy showed that the decedent's other vital organs were normal. Dr. Renfro stated that a lack of ventilation or cerebral perfusion, which were under the control of Dr. Ura, "seem[ed] to be the most likely explanation of these events."

After the close of the plaintiff's proof, Dr. Jay Michael Ura, a board-certified anesthesiologist, testified that he had "no definite knowledge" of why the decedent failed to awaken after the surgery. He believed that he complied with the standard of care applicable to anesthesiologists in Nashville, Tennessee, and that the death was not related to his actions or omissions.

Although Dr. Ura conceded that his duty was to "assure cerebral perfusion," he testified that he does not monitor cerebral perfusion pressure separately from blood pressure. During the surgery, Dr. Ura took a blood pressure reading with an upper arm cuff every two and one-half minutes and recorded vital signs every five minutes. Dr. Ura believed that the decedent's blood pressure, as measured at heart level with the upper arm cuff, was sufficient to maintain cerebral perfusion pressure throughout the surgery. Dr. Ura testified that measuring a patient's cerebral perfusion pressure would require cranial monitoring devices that were not required by the applicable standard of care.

Dr. Ura did not know of a formula by which to convert the mean arterial pressure at heart level to cerebral perfusion pressure. He did not believe there was a "significant difference" in the

blood pressure maintained by the decedent during the surgery and the pressure needed to maintain cerebral perfusion. He also did not think the effect of gravity was significant, even where a patient is placed in an angled position during the surgery. Dr. Ura did not "accept" the numbers used by Dr. Witt in the formula calculating cerebral perfusion pressure as adjusted for the effect of gravity. Moreover, Dr. Ura stated that even if the mean arterial pressure as measured at heart level was adjusted for gravity, the decedent's auto-regulation process would have maintained normal cerebral perfusion.

Dr. John Eichorn, a board-certified anesthesiologist, testified on behalf of the defendants. Although he agreed that a lack of oxygen to the brain during surgery was the "most reasonable explanation" for the decedent's death, Dr. Eichorn believed that the decedent's carotid arteries were occluded or compressed by unforeseeable "external forces." Dr. Eichorn stated, for instance, that the decedent had an elongated styloid process that may have compressed or occluded the flow of blood in the left carotid artery and that the manipulation of the decedent's right shoulder during the surgery may have caused his head to tilt or turn far enough to the left to cause the occlusion or compression. Dr. Eichorn also stated that there may have been blockage in the right carotid artery due to a palpable mass in the decedent's neck from the injection of the interscalene block.

Dr. Eichorn conceded that he did not think of the occlusion theories when he first examined the medical records and depositions in June of 1996. He first thought of the theory in December of 1998 after counsel for Dr. Ura sent him an article on the effects of an elongated styloid process. Dr. Eichorn stated that the article caused "the light to go on" because the autopsy had revealed that the decedent's left styloid was larger than his right styloid. Dr. Eichorn conceded, however, that there was no evidence that the decedent's neck had turned or tilted to the left during the surgery and that there was no evidence of an inflammation from the interscalene block.[3] He also conceded that the pathology findings indicated that the decedent's Circle of Willis and carotid arteries were normal. He acknowledged that he knew of no publications or reported cases that were similar to his "carotid artery occlusion" theory.

Dr. Eichorn testified that a normal blood pressure measured with an upper arm cuff during surgery normally reflects cerebral perfusion pressure. He did not believe that gravitational effects are significant enough to compromise the flow of blood to a patient's head. Dr. Eichorn believed that the risks of performing surgery in a head-elevated position were "overplayed" or "over-emphasized" and that the only way to measure cerebral perfusion pressure with "precision" is to use an interior cranial monitor.

Following the trial, the jury awarded a verdict for the plaintiff in the amount of $43,950 in medical expenses, $11,360.64 in funeral expenses, and $5,800,000 for compensatory damages. The

_____

[3] Dr. Renfro testified during his deposition that the decedent's head was in a neutral position during the surgery. Dr. Ura also testified that he checked the decedent's head on at least three occasions during the surgery and that, on each occasion, his head was not turned or tilted.

trial court later overruled the defendants' motion for a new trial but suggested a remittitur of $1,500,000.

The defendants appealed to the Court of Appeals, raising eighteen issues. The plaintiff, in turn, argued that the trial court had erred in remitting the jury's verdict and in denying prejudgment interest. The Court of Appeals concluded that the trial court committed reversible error in granting the plaintiff eight peremptory challenges instead of four, allowing the plaintiff to cross-examine a defense expert witness with a prior statement and a learned treatise, and excluding the deposition of a defense expert witness. The court pretermitted the remaining issues and remanded for a new trial.

We granted the plaintiff's application for permission to appeal.

## ANALYSIS

### Peremptory Challenges

We will first address whether the Court of Appeals correctly held that the trial court committed reversible error in granting the plaintiff eight peremptory challenges during jury selection.

The plaintiff concedes that a party in a civil trial is entitled to four peremptory challenges pursuant to Tennessee Code Annotated section 22-3-105 (1994) but argues that the trial court properly allowed an additional four peremptory challenges based on the loss of consortium claims filed on behalf of the decedent's two minor sons. The plaintiff also argues that any error committed by the trial court did not affect the outcome or prejudice the administration of justice.

On the other hand, the defendants assert that the trial court violated the plain statutory language of Tennessee Code Annotated section 22-3-105 by allowing the plaintiff eight peremptory challenges during jury selection. The defendants argue that the Court of Appeals properly held that the error was prejudicial to the administration of justice and required a new trial.

We begin our review of this issue with Tennessee Code Annotated section 22-3-105(a), which provides that "[e]ither party to a civil action may challenge four (4) jurors without assigning any cause." The statute further states:

> In the event there is more than one (1) party plaintiff or more than (1) party defendant in a civil action, four (4) additional challenges shall be allowed to such side or sides of the case; and the trial court shall in its discretion divide the aggregate number of challenges between the parties on the same side which shall not exceed eight (8) challenges to the side, regardless of the number of parties. Even when two (2) or more cases are consolidated for trial purposes, the total challenges shall be eight (8), as herein provided.

Tenn. Code Ann. § 22-3-105(b).

We agree with the Court of Appeals' conclusion that the plain language of Tennessee Code Annotated section 22-3-105(a) allows a plaintiff four peremptory jury challenges in a civil action. See Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003) (courts must apply the plain meaning of statutory language). Indeed, there is no statutory language upon which to conclude that a plaintiff may receive more than four peremptory challenges in a wrongful death action based on attendant loss of consortium claims. Tenn. Code Ann. §§ 22-3-105(a)–(b). Moreover, we have held that a wrongful death action is a single cause of action:

> The parties do not dispute that the statutes permitting an action for the wrongful death of another create "no right of action exist[ing] independently of that which *the deceased* would have had had [he or she] survived." Although the living beneficiaries of the action may seek a limited recovery for their own losses in addition to those of the decedent, the right of action itself remains one that is "single, entire, and indivisible." In point of fact, therefore, "[t]here can be but one cause of action for the wrongful death of another."

Kline v. Eyrich, 69 S.W.3d 197, 206-07 (Tenn. 2002) (emphasis added) (citations omitted). Accordingly, because there was only one party plaintiff in this case, the trial court erred in allowing the plaintiff eight peremptory challenges.

We must next determine whether the trial court's violation of Tennessee Code Annotated section 22-3-105(a) required a new trial. In Blackburn v. Hays, 44 Tenn. 227, 230 (1867), this Court remanded for a new trial after concluding that the trial court erred in allowing a plaintiff more than the two peremptory challenges as then allowed under statutory law. That decision, however, which was based on the predecessor to Tennessee Code Annotated section 22-3-105, did not analyze whether the trial court's error was harmful to the defendant or to the administration of justice. Id. As a result, Blackburn is of limited use in resolving this case.

In Tuggle v. Allright Parking Sys., Inc., 922 S.W.2d 105, 107 (Tenn. 1996), this Court concluded that the trial court erred in granting the plaintiff *fewer* than the four peremptory challenges allowed by Tennessee Code Annotated section 22-3-105. We emphasized that the rules prescribing jury selection procedures insured "uniformity, impartiality, and fairness in jury selection." Id. at 108. We held that the plaintiff "was denied the use of his statutorily mandated number of peremptory challenges" and that the "denial of that right, which was designed to safeguard the administration of justice, constitutes prejudice to the judicial process and requires a reversal." Id.; see also Crawford v. Heaberg, 709 S.W.2d 611, 613 (Tenn. Ct. App. 1986) (new trial was required where the plaintiffs were denied the full number of peremptory jury challenges).

In State v. Coleman, 865 S.W.2d 455, 458 (Tenn. 1993), however, this Court held the trial court's failure to comply with required jury selection procedures did not require a new trial. In that

case, the trial court allowed selection of eighteen jurors for voir dire, instead of the twelve required by the Rules of Criminal Procedure, and then allowed the parties to exercise challenges for cause and the maximum number of peremptory challenges. Id. Although we cautioned that compliance with the rules prescribing jury selection "safeguards the judicial process and protects the administration of justice," we concluded that there was no reversible error because the defendant failed to show that the jury was unfair, that he was denied his right to challenge jurors for cause, or that he was denied the use of his statutorily-mandated number of peremptory challenges. Id.

In considering these principles, we first emphasize that there was no showing that the defendants suffered actual harm or prejudice as a result of the trial court's ruling. Indeed, contrary to Blackburn, an apparent majority of courts have required a showing of actual harm when a party has received an *excessive* number of peremptory challenges. As the Alaska Supreme Court has observed:

> The numerical weight of authority in civil cases supports the rule that a judgment will not be reversed for error in allowing one or more peremptory challenges in excess of that provided by statute, unless the complaining party shows that he has exhausted his peremptory challenges and has suffered material injury from the action of the court, and that as a result thereof one or more objectionable jurors sat on the case, or for some other equally cogent reasons.

Bohna v. Hughes, et al., 828 P.2d 745, 762 (Alaska 1992) (citations omitted); see also Praus ex rel. Praus v. Mack, 626 N.W.2d 239, 255-56 (N.D. 2001) (concurring opinion).[4]

In this case, the defendants did not object to the trial court's ruling on peremptory challenges and did not object to the competency of the jurors who were empaneled. Like the plaintiff, the defendants received eight peremptory challenges, of which they exercised five. The defendants have identified no jurors who would have been retained or excused were it not for the trial court's ruling. Accordingly, there has been no showing that the defendants were actually harmed or prejudiced by the trial court's ruling.

In addition, we disagree with the Court of Appeals that the trial court's error prejudiced the administration of justice. Unlike in Tuggle, neither party was *denied* the statutorily-mandated number of peremptory challenges under Tennessee Code Annotated section 22-3-105(a) and (b), and neither party was given *fewer* than the required number of peremptory challenges. Indeed, both parties received eight peremptory challenges. Although maintaining uniformity in jury selection procedures is an important concern, that concern alone does not prejudice the administration of justice in a case where no party has been *denied* a right to a specific procedure or remedy, no party

---

[4] See also G. R. Jacobi, Effect of Allowing Excessive Number of Peremptory Challenges, 95 A.L.R.2d 957, § 3(a) (1964).

has suffered even the potential for harm, and no party has shown that harm was caused to the administration of justice. See Coleman, 865 S.W.2d at 458; see also Bohna, 838 P.2d at 762.[5]

In sum, although the trial court erred in granting the plaintiff eight peremptory challenges, the error did not harm the administration of justice and did not result in actual harm to the defendants.

### Cross Examination:  Prior Statement

We next address whether the Court of Appeals correctly held that the trial court erred in denying a motion for a mistrial after the plaintiff cross-examined a defense expert witness, Dr. John Eichorn, with a prior statement in which the witness had described his role as a defense expert in an unrelated case.  The trial court ruled that the cross-examination was improper but that a mistrial was not warranted.

The record reveals that the following exchange occurred during the cross-examination of Dr. Eichorn:

> Q. Do you perceive it as your role in participating in a case for the defense, with issues like this, that it is incumbent upon you to create a theory of defense.
>
> A. No.
>
> Q. That would be inappropriate, wouldn't it?
>
> A. And potentially not possible.
>
> Q. Do you consider it your role to be an advocate for the party for whom you're testifying?
>
> A. No.
>
> Q. That would be inappropriate, wouldn't it?
>
> A. Correct.
>
> . . . .

---

[5] Because Blackburn involved a predecessor statute to Tennessee Code Annotated section 22-3-105, that decision is not squarely on point.  To the extent that Blackburn is inconsistent with our decision today, however, it is overruled.

Q.     Now let me take it like this, and make it a little bit more specific. You've testified in a case before where you were the expert witness for an anesthesiologist where the blood pressure got too low and the patient's brain died, haven't you.

A.     I don't recall specifically, but it's certainly possible.

Q.     Well, we're going to – let me see if I can help you. Have you ever before, Dr. Eichorn, in serving in this type of role, when serving as an expert witness for an anesthesiologist, sued because a patient came out of surgery brain dead because of low blood pressure, said to the defense lawyer who hired you, 'There are big problems with what your anesthesiologist did, but I will help you create a theory to defend this case, and short of hiring an outright prostitute, I'm the best you are going to find?' Have you ever said that?

After the defense objected, Dr. Eichorn denied that he made the statement.

In a jury-out hearing, counsel for the plaintiff proffered a letter in which a lawyer attributed the statement to Dr. Eichorn in an unrelated case and argued that the witness could be impeached with the prior inconsistent statement and with evidence of his bias in favor of the defendants. The defendants argued that there was no factual basis upon which to find that Dr. Eichorn had made the statement.[6]

The trial court concluded that the statement was not admissible to impeach Dr. Eichorn as a prior inconsistent statement under Rule 613 of the Tennessee Rules of Evidence because its probative value was substantially outweighed by its prejudicial effect. The trial court also found that the prior statement could not be used to show Dr. Eichorn's bias in favor of the defendants under Rule 616 of the Tennessee Rules of Evidence. The trial court's offer to instruct the jury to disregard the question was declined by the defendants. The trial court denied the defendants' later motion for a mistrial.

The Court of Appeals held that there was no reasonable factual basis for the question and that the cross-examination of Dr. Eichorn with the prior statement was reversible error under Rule 613.

---

[6] The defendants' objection was based on Tennessee Rule of Evidence 608(b), which governs the admissibility of a witness's prior *conduct* for impeachment. Although the trial court also mentioned Rule 608(b), its ruling was properly based on Rule 613, which governs a witness's prior *statements*, and Rule 616, which governs a witness's possible bias. Our review, therefore, encompasses the trial court rulings under Rules 613 and 616.

*Prior Inconsistent Statements*

The trial testimony of a witness may be impeached with a prior written or oral statement made by the witness. Tenn. R. Evid 613; see Neil P. Cohen, et al., Tennessee Law of Evidence § 6.13 (4th ed. 2000) ["Cohen, et al"]. When a witness is examined about a written or oral statement, "the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel." Tenn. R. Evid. 613(a). Extrinsic evidence of a prior inconsistent statement "is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b).

A prior statement being used to impeach a witness "must be inconsistent with the witness's trial testimony." Cohen, et al., § 6.13[3] at 6-134. Although Rule 613(b) does not define "inconsistent," a prior inconsistent statement made by a witness must have "a reasonable tendency to discredit the testimony of the witness." Cohen, et al., § 6.13[3] at 6-133 (quoting Michael H. Graham, 1 Handbook of Federal Evidence 882 (4th ed. 1996)). The trial court may exclude evidence of the prior inconsistent statement if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or a risk of undue delay. Tenn. R. Evid. 403.

In our view, the trial court did not abuse its discretion in ruling that the plaintiff could not use the prior statement attributed to Dr. Eichorn for impeachment as a prior inconsistent statement. Although the plaintiff made a credible argument that the prior statement was inconsistent with Dr. Eichorn's testimony that his role as an expert witness does not include creating a theory of defense or acting as an advocate, the trial court was concerned with the reliability and probative value of the alleged prior statement. Indeed, the trial court found that the statement was a "characterization" made by a lawyer in an unrelated case and was not a prior inconsistent statement made by Dr. Eichorn. In addition, the trial court concluded that the probative value of the alleged prior statement was substantially outweighed by the risk of unfair prejudice to the defense. The record does not demonstrate that the trial court abused its discretion.

*Bias*

Rule 616 of the Tennessee Rules of Evidence states that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Common examples of bias or prejudice include promises of leniency made to a witness, threats made against a witness, a witness's personal stake in the outcome of the litigation, a witness's settlement or pending settlement with a party involved in the litigation, a witness's relationship to a party in the lawsuit, a witness's motives for testifying, a witness's relevant mental health problems, and racial animosity. Cohen et al., § 6.16[4].

In our view, the trial court did not abuse its discretion in ruling that the plaintiff could not use the prior statement attributed to Dr. Eichorn for impeachment as evidence of bias. As noted above, the trial court found that the alleged prior statement was a "characterization" attributed to Dr. Eichorn by a lawyer in an unrelated case. The trial court also found that the prior statement, which was allegedly made in a case involving different parties, different defendants, and different insurers, did not have probative value in showing that Dr. Eichorn favored the defendants or the defendants' insurer in this case. Similarly, the trial court indicated that the alleged prior statement was of minimal probative value in demonstrating Dr. Eichorn's bias in favor of the defense in all cases, particularly since he had testified on behalf of plaintiffs and defendants in other cases. In short, the record does not show that the trial court abused its discretion.

*Denial of Mistrial*

Whether to grant a mistrial is a decision left to the discretion of the trial court. State v. Saylor, 117 S.W.3d 239, 250 (Tenn. 2003); see also McCullough v. Johnson City Emergency Physicians, P.C., 106 S.W.3d 36, 47 (Tenn. Ct. App. 2002). In our view, the trial court did not abuse its discretion in refusing to grant the defendants' motion for a mistrial based on the reference to Dr. Eichorn's alleged prior statement for several reasons.[7]

First, we note that after the defendants objected to the question, Dr. Eichorn denied in the jury's presence that he made the prior statement. Second, the trial court offered to instruct the jury to disregard the improper question, but the defendants declined the trial court's offer of corrective action. Third, the trial court's ruling prevented the plaintiff from asking additional questions based on the alleged prior statement or from using extrinsic evidence. As a result, the single improper question must be viewed in the context of Dr. Eichorn's entire testimony, which consisted of over 250 pages of transcript and hundreds of questions on both direct and cross-examination. Dr. Eichorn's credentials, educational background, experience, and theories as to what happened in this case were fully presented to the jury and later argued by counsel for both sides in summation. Accordingly, the trial court did not abuse its discretion in denying a motion for a mistrial based solely on a reference to an alleged prior statement that was denied by Dr. Eichorn.[8]

---

[7] The trial court implicitly denied the defendants' motion for the mistrial by continuing with the trial after ruling on the use of the alleged prior statement. The trial court later reiterated that the defendants failed to show grounds for a mistrial when denying the defendants' motion for a new trial on this ground.

[8] Similarly, we reject the defendants' related issue that the trial court erred in allowing the plaintiff to "ambush" Dr. Eichorn with the prior statement. As noted, Rule 613 does not require that the witness be shown a prior inconsistent statement before being questioned about the statement. Moreover, contrary to the defendants' assertion, the trial court found that the plaintiff's counsel had a good faith basis for attempting to pursue this issue.

-12-

## Cross-Examination:  Learned Treatise

We next address whether the Court of Appeals correctly held that the trial court erred in allowing the plaintiff to cross-examine Dr. Eichorn with a learned treatise without first identifying the treatise and establishing the treatise to be reliable.  See Tenn. R. Evid. 618.

The plaintiff argues that the Court of Appeals erred in holding that the cross-examination was improper because there was no showing that a learned treatise was being used in challenging Dr. Eichorn's testimony and opinions as to the cause of the decedent's death.  The defendants argue that the Court of Appeals properly concluded that the cross-examination relied upon a learned treatise that was not identified and established to be reliable as required by Rule 618.

The record reveals that the following exchanges occurred during the plaintiff's cross-examination of Dr. Eichorn:

> Q.     Let me see if you agree with this concept:  Hypotension from any cause may produce cerebral or spinal cord inschemia.  Hypotension may be associated with positioning and is usually caused by venous pooling; that is, the sitting position, or decreased venous return, as in a prone position with increased intra-abdominal pressure.  And that second part we did not have in that case, did we?
>
> A.     Correct.
>
> . . . .
>
> Q.     Hypotension may be associated with positioning and is usually caused by venous pooling, e.g., the sitting position.  When the head and spinal cord are elevated above the level of the heart, blood pressure should be referenced to head level to ensure that monitored pressure reflects perfusion pressure.  Do you agree or disagree with that?
>
> . . . .
>
> Q.     Are you familiar with the Manual of Complications in Anesthesia?
>
> A.     There are two or three of them, which one?
>
> Q.     How about Michael Mahla?

A. Say that again.

Q. Mahla. M-A-H-L-A?

A. I don't believe I have that book.

Q. You've got those in your library, don't you?

A. It's possible. I don't know.

Q. Do you consider those to be reliable texts, <u>Complications in Anesthesia</u>?

A. I understand the nature of your question. I don't choose to characterize any textbook or publication as authoritative or reliable, because, frankly, they're just words.


Defense counsel objected on the ground that the text was not shown to be reliable, but the trial court allowed the cross-examination to continue. Although the Mahla text is not again mentioned, the transcript shows the following:

Q. Let me see if you agree with this. For patients in a head elevated position, the appropriate zero reference for blood pressure is the brain at the external meatus, not the heart. Failure to use the brain as the zero reference, after sitting a patient up, will lead to an overestimation of cerebral perfusion pressure. Do you agree or disagree with that?

A. In very specific selected circumstances, I would agree with that. A sitting posterior fossa craniotomy would fall under that rubric. This type of procedure that we're talking about today would not.

. . . .

Q. Accidental hypotension is quite probably the most frequent complication of the sitting position. It's presence requires rapid detection and prompt treatment if significant cerebral hypoxia is to be avoided. Agree or disagree?

A. Again, same answer. In selected circumstances, because if you used the exact words – and that passage used the words

-14-

'sitting position,' you must understand – and the jury needs to understand – that that concept was generated in the anesthesiology teaching and literature having to do with patients sitting bolt upright. . . . In that kind of sitting position, yes that's a valid statement. Applied to the type of surgery that this patient had that we're talking about today, no, it doesn't apply.

Rule 618 of the Tennessee Rules of Evidence contains the requirements for impeaching an expert witness with a learned treatise:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice, may be used to impeach the expert witness's credibility but may not be received as substantive evidence.

Rule 618 allows a party to impeach an expert witness by testing the expert's knowledge and understanding of a topic at issue. Cohen et al., § 6.18[2]. When the requirements of Rule 618 are satisfied, the most common approach for using this impeachment technique is for counsel to read a portion of a treatise, ask the expert witness whether he or she agrees with the treatise, and compare the treatise with the expert's response. Id. at § 6.18[2][b].

In considering these principles, we first emphasize that the record is not entirely clear on this issue. As noted, the defendants initially objected on the basis that the Mahla treatise was not shown to be reliable or authoritative. When Dr. Eichorn declined to identify this treatise (or indeed, any textbook) as authoritative, no questions were asked based on the Mahla treatise, nor was the treatise shown to be physically present or used in any way. When the trial court overruled the defendants' objection by allowing the cross-examination to continue, the plaintiff asked Dr. Eichorn to agree or disagree with several principles without mentioning the Mahla treatise or any other learned treatise, just as the plaintiff had done before the Mahla treatise was mentioned. The plaintiff asserted at trial and maintains on appeal that these questions were not read from a specific learned treatise, but rather, were based on the testimony and evidence already presented at trial. Indeed, the plaintiff notes that Dr. Eichorn was not asked to compare his testimony to another source and was not asked to explain why his testimony differed from another specific source.

We cannot presume that there was reversible error based on the record before us. After the defendants objected to the mention of the Mahla treatise, that treatise was never again mentioned. Moreover, the defendants did not make any further *specific* objections to the questioning, did not

make an offer of proof, and did not ask the trial court to make factual findings as to whether a learned treatise was being used during the subsequent cross-examination. In short, we cannot presume that a learned treatise was being used in violation of Rule 618 based solely on how the questions were phrased.

Accordingly, the Court of Appeals erred in concluding that the trial court committed reversible error in allowing the cross-examination of Dr. Eichorn.

## Exclusion of Dr. Hays' Deposition

We next address whether the Court of Appeals properly concluded that the trial court erred in excluding the deposition testimony of Dr. Michael W. Hays, a defense expert witness.

The plaintiff argues that the trial court properly excluded Dr. Hays' testimony after finding that it was speculative on the issue of what caused the decedent's death. The defendants maintain that the Court of Appeals correctly reversed the trial court's ruling because Dr. Hays' testimony presented "possible alternative causes" of the decedent's death.

The record shows that the plaintiff filed a motion to exclude the deposition testimony of three expert witnesses for the defense who discussed the "carotid artery occlusion" as the cause of the decedent's death in this case: Dr. Michael Hays, Dr. Ballard Wright, and Dr. Eichorn. In granting the motion as to Dr. Hays, the trial court found that Dr. Hays made numerous references to occlusion being a "possible" cause of death in this case and concluded that "the overwhelming weight of his testimony indicate[d] that he believes this theory is only a possibility."[9] The trial court emphasized that when Dr. Hays was asked whether a loss of blood flow was the cause of death to a reasonable degree of medical certainty, he replied:

> [T]here seems to be information that would support that that could possibly impinge on the carotid artery. He had a block on the opposite side which could decrease blood flow through that artery and then he could be positioned in a way that could slightly decrease flow through the vertebral arteries.

The trial court also emphasized Dr. Hays' following statements:

> Q: In your opinion, is [occlusion] a probable explanation as to the outcome?

[9] Because Dr. Hays' testimony was ruled inadmissible for being speculative, the trial court noted that the testimony did not have to be evaluated under McDaniel v. CSX Transp. Inc., 955 S.W.2d 257 (Tenn. 1997), which governs the admissibility of scientific evidence. In contrast, the trial court later held an evidentiary hearing to assess the testimony of Drs. Wright and Eichorn under McDaniel and concluded that their testimony as to the "carotid artery occlusion" theory was admissible.

A:      Probable versus –

Q:      Yes.

A:      It is possible.

        . . .

Q:      The compromise on the flow on the left, you say, is a possibility?

A:      It's possible, yes.

Q:      The compromise of flow on the right you characterize as a possibility?

A:      Possibility.

Q:      Compromising the vertebrals you characterized as a possibility?

A:      That's correct.

Q:      Now, do you equate three possibilities to make it probable that that's in fact what did happen or are you just saying that they're all three possibilities and it is my best explanation I can offer?

A:      I think the latter.

Determining the admissibility, qualifications, relevance, and competency of expert testimony is left to the sound discretion of the trial court. See McDaniel, 955 S.W.2d at 263. Here, the trial court fully considered Dr. Hays' deposition, found that Dr. Hays' theory as to the cause of death was speculative, and concluded that the testimony was inadmissible. The trial court supported its conclusion with detailed written findings. Although the dissent now relies on portions of Dr. Hays' deposition for its view that the testimony was admissible, the totality of Dr. Hays' testimony supports the trial court's finding that his theory was based on mere possibility. Indeed, our function is only to determine whether the trial court abused its discretion in excluding the testimony and not to substitute our view for that of the trial court. McDaniel, 955 S.W.2d at 263-64.

In addition, the record does not support the Court of Appeals' holding, and the dissent's view, that the trial court's exclusion of Dr. Hays' testimony affected the result of the trial. The trial court contrasted the testimony of Dr. Hays with Drs. Wright and Eichorn, conducted an additional hearing, and ruled that the testimony of Drs. Wright and Eichorn was admissible. Dr. Eichorn

-17-

testified in great detail about the "carotid artery occlusion" theory on behalf of the defendants at trial. The defendants' alternative theory as to the cause of death was fully presented and argued to the jury. Accordingly, given the trial court's full consideration, detailed findings, and admission of other expert testimony on this issue, we conclude that the trial court did not abuse its discretion and that the trial court's exclusion of Dr. Hays' deposition did not affect the result of the trial.

In reaching our conclusion, we necessarily reject the view that Dr. Hays' testimony was admissible as evidence of a "possible" alternative to the plaintiff's theory under Sakler v. Anesthesiology Assocs., P.S.C., 50 S.W.3d 210 (Ky. Ct. App. 2001). In Sakler, the court stated in part:

> We conclude that defendants in medical malpractice actions may introduce expert testimony to rebut a plaintiff's expert witness testimony couched in terms of "reasonable medical probability," even though the defendant's expert witness's testimony is couched only in terms of "possibility."

Id. at 213. The court reasoned that requiring defendants to establish other causes within a reasonable degree of medical probability "would unduly tie a defendant's hands in rebutting a plaintiff's case." Id. at 214; see also Wilder v. Eberhart, 977 F.2d 673, 676 (1st Cir. 1992).

In our view, the Sakler rule is not needed to avoid shifting the burden of proof to the defendants and would instead, if applied literally, allow defendants to use expert testimony as to "possible" theories or causes without satisfying the safeguards in Rules 702 and 703 of the Tennessee Rules of Evidence. These evidentiary rules require a trial court to determine 1) whether expert testimony will substantially assist the trier of fact in determining a fact in issue, and 2) whether the facts and data underlying the testimony indicate a lack of trustworthiness. Tenn. R. Evid. 702, 703. Indeed, expert testimony that a trial court determines is speculative would not "substantially assist" the trier of fact. Nothing in the evidentiary rules or elsewhere exempts defendants from these fundamental evidentiary inquiries.

In addition, determining the admissibility, qualifications, relevance, and competency of expert testimony is left to the discretion of the trial court. See McDaniel, 955 S.W.2d at 263. Adopting the Sakler rule applied by the Court of Appeals and supported by the dissent would effectively eliminate the trial court's discretion concerning a defendant's use of expert testimony. We believe that the rule from Sakler is not appropriate in this case, in which the trial court specifically found the expert testimony to be speculative, and we hold that the trial court did not abuse its discretion in excluding Dr. Hays' deposition.

### Remaining Issues

We have resolved the primary issues raised in the plaintiff's application for permission to appeal and could remand the case to the Court of Appeals for its consideration of the remaining

-18-

issues. In the interests of judicial efficiency, however, and because this case has been pending in our judicial system for a substantial period of time, we elect to review the remaining issues raised by both the plaintiff and the defendants, most of which were pretermitted by the Court of Appeals.

*Remittitur*

The plaintiff argues that the trial court erred in reducing the jury's verdict by an amount of $1,500,000 because the evidence supported the jury's verdict and the jury's general verdict form did not distinguish damages awarded for loss of earning capacity from damages awarded for loss of consortium. The defendants argue that the trial court correctly suggested a remittitur that was accepted by the plaintiff.

The plaintiff presented evidence establishing that the present value of the decedent's lost earning capacity was $2,755,125 when calculated using an assumed work-life expectancy of 63.4 years and was $5,200,000 when calculated using an assumed life expectancy of 77 years. The plaintiff also showed that medical expenses were $43,950 and that funeral expenses were $11,360.64. Finally, the plaintiff presented the testimony of the decedent's wife and sons in support of their loss of consortium claims. The jury returned a verdict in the amount of $5,800,000.

The trial court found that the evidence supported the jury's verdict, and it noted that "there was a wonderful relationship between Mr. and Mrs. Hunter and between Mr. Hunter and his family." The trial court noted that there was no way "to measure the relationship between this father and the two sons and certainly to Ms. Hunter" and that "[e]very case stands or falls probably on its own facts." Nonetheless, in suggesting a remittitur of $1,500,000, the trial court found that the jury's verdict was "excessive in this case" because "these children are almost adults, or one is an adult and one will be an adult two years from now." The trial court commented that "in the whole scheme of things, I believe the loss of consortium evidence would lead me to believe that it was excessive."

In a wrongful death action, the plaintiff may receive damages for the pecuniary value of the decedent's life. See Thrailkill v. Patterson, 879 S.W.2d 836, 841 (Tenn. 1994). A spouse or child of the decedent may also receive damages for the loss of consortium, which is included in the pecuniary value of the decedent's life. Jordan v. Baptist Three Rivers Hosp., 984 S.W.2d 593, 601-02 (Tenn. 1999). In Jordan, this Court said:

> Loss of consortium consists of several elements, encompassing not only tangible services provided by a family member, but also intangible benefits each family member receives from the continued existence of other family members. Such benefits include attention, guidance, care, protection, training, companionship, cooperation, affection, love, and in the case of a spouse, sexual relations.

Id. at 602. Although "[a]dult children may be too attenuated from their parents in some cases to proffer sufficient evidence of consortium losses," the "age of the child does not, in and of itself,

-19-

preclude consideration of parental consortium damages." Id. at 601; see also Davidson v. Lindsey, 104 S.W.3d 483, 493 (Tenn. 2003).

A jury's verdict in damages need not be reviewed for mathematical precision or certainty. Thrailkill, 879 S.W.2d at 841. However, the practice of remittitur was developed to correct excessive jury verdicts without requiring a costly and time-consuming new trial. Id. at 840; see also Tenn. Code Ann. § 20-10-102 (1994). Our review of a trial court's suggested remittitur is "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Thrailkill, 879 S.W.2d at 841 (quoting Tenn. R. App. P. 13(d)).

In our view, the evidence in the record preponderates against the trial court's remittitur of the jury's verdict in the amount of $1,500,000. Although the trial court found that the verdict was excessive as to the damages awarded for the loss of consortium, there is no way to determine from the jury's general verdict form what amount of damages were awarded for the loss of earning capacity and what amount of damages were awarded for the loss of consortium. Indeed, the plaintiff introduced evidence of loss of earning capacity between $2,755,125 and $5,200,000, depending on how long the decedent would have worked. Moreover, even if a portion of the verdict was for the loss of consortium claims, there is no way to know whether and how the jury apportioned the loss of consortium damages among the three claimants.

Finally, although the trial court expressed concern that the consortium damages were excessive because the decedent's children were adults (or nearly adults) at the time of the post-trial hearing, the record reveals that the children were seventeen and fifteen years old at the time of their father's death. Our holding in Jordan implicitly recognized that the loss of consortium begins at the time a parent is lost and not at the time the trial occurs. See Jordan, 984 S.W.2d at 601 (parental consortium recognizes a child's loss of nurture, education, guidance, advice, training, love, and companionship).

Accordingly, a trial court must make specific factual findings as to the weight or sufficiency of the evidence when suggesting a remittitur, particularly where there is a general jury verdict form that does not explain the damage award. In the absence of such findings, we conclude that the evidence in the record preponderated against the trial court's suggested remittitur.

*Prejudgment Interest*

Finally, the plaintiff argues that the trial court also erred in refusing to award prejudgment interest as part of the damages in this case. The defendants argue that the trial court properly found that prejudgment interest was not appropriate because the amount of damages was not reasonably ascertainable and the existence of the obligation was disputed and contested.

A trial court has the discretion to award prejudgment interest. Myint v. Allstate Ins. Co., 970 S.W.2d 920, 927 (Tenn. 1998). The purpose of prejudgment interest "is to fully compensate a

plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." Id. The trial court must consider whether the amount of the obligation was certain or ascertainable and whether the existence of the obligation was disputed on reasonable grounds. Id. The factors must be applied equitably and are not rigid requirements:

> The uncertainty of either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable. The certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances.

Id. at 928.

The record reveals that the trial court gave extensive consideration to this issue and fully analyzed the plaintiff's arguments and evidence. The trial court expressed concern about the time that had elapsed prior to trial, as well as the uncertainty as to the existence and amount of the possible obligation. There is no indication that the trial court failed to consider the relevant factors or that the trial court considered any of the factors dispositive. After reviewing the extensive record, we cannot conclude that the trial court abused its discretion. See Alexander v. Inman, 974 S.W.2d 689, 698 (Tenn. 1998).

### *Constitutionality of Consortium Claims*

The defendants argue that allowing damages for the loss of consortium under the retrospective application of Jordan v. Baptist Three Rivers Hosp., 984 S.W.2d 593 (Tenn. 1999), violated article I, section 20 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. The plaintiff argues that the defendants failed to raise this issue prior to or during the trial and that, in any event, there was no constitutional error.

This issue is resolved by our decision in Hill v. City of Germantown, 31 S.W.3d 234 (Tenn. 2000). In Hill, we expressly held that our decision in Jordan was to apply retroactively to: "(1) all cases tried or retried after the date of our decision in Jordan; and (2) to all cases pending on appeal in which the issue decided in Jordan was raised at an appropriate time." Id. at 240. The defendants have cited no convincing reasons or authority for us to reconsider or overrule our decision in Hill.

### *Locality Rule*

The defendants argue that the trial court erred in allowing the testimony of the plaintiff's expert witness, Dr. Witt, because he did not know the recognized standard of professional care in the community in which the defendant Ura practiced or in a similar community as required by Tennessee Code Annotated section 29-26-115(a)(1). The defendants also argue that the trial court

erred in failing to direct a verdict for the defendants on this basis. The plaintiff maintains that the trial court properly found that Dr. Witt was qualified to testify under the so-called "locality rule" and properly refused to direct the verdict for the defendants.

The record reveals that the defendants did not object to Dr. Witt's testimony prior to trial but instead examined Dr. Witt on this issue during trial and then moved to exclude his testimony. In concluding that Dr. Witt's testimony established the requirements of Tennessee Code Annotated section 29-26-115(a)(1) (2000), the trial court observed:

> [I]n this particular case, obviously he's never practiced medicine here, he has been here six to eight times, for reasons some medical [and] some personal; he knows people at Vanderbilt; he has been at national conferences with people – not just any old people but anesthesiologists; he in his university position, and serving on some of these national committees, he would have as much or more familiarity with Nashville as he would with other communities.

In a malpractice action, the plaintiff must establish the "recognized standard of acceptable professional practice in the profession . . . that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred." Tenn. Code Ann. § 29-26-115(a)(1). A medical expert relied upon by the plaintiff, therefore, "must have knowledge of the standard of professional care in the defendant's applicable community or knowledge of the standard of professional care in a community *that is shown to be similar* to the defendant's community." Robinson v. LeCorps, 83 S.W.3d 718, 724 (Tenn. 2002).

In Robinson, we held that the plaintiff's expert, an orthopaedic surgeon, failed to establish the standard of professional standard of care applicable to orthopaedic surgeons in Nashville, Tennessee. Id. at 721. The expert's deposition showed that he believed the standard of care in Nashville was "the same as a national standard" and that "[t]here is no differentiation recognized in our profession of one locality as opposed to the other . . . ." Id. In holding that the testimony did not satisfy Tennessee Code Annotated section 29-26-115(a)(1), we emphasized that the expert witness did not "relate the basis for his knowledge of the standard of care . . . or indicate why the Nashville medical community was similar to, and thus had the same standard of professional care as, the community with which [he] was familiar." Id. at 725. In sum, we concluded that an expert witness's reference to a national standard of care "may not substitute for evidence that first establishes the requirements of Tennessee Code Annotated section 29-26-115(a)(1)." Id. at 724.

In Stovall v. Clarke, 113 S.W.3d 715, 723 (Tenn. 2003), however, we held that the testimony of the plaintiff's expert witness, an internal medicine specialist who practiced in Missouri, satisfied Tennessee Code Annotated section 29-26-115(a)(1) where the defendant physician practiced in Franklin, Tennessee. We emphasized that the expert witness testified that he had reviewed twenty medical charts in Tennessee, had testified in three malpractice cases in Tennessee, and had reviewed information about the medical community in which the defendant practiced. Id. Moreover, we

contrasted the case with <u>Robinson</u> by observing that the plaintiff's expert did not rely solely on a national standard of care but instead "showed some underlying basis for his testimony." <u>Id.</u>

In our view, the record before us supports the trial court's finding that Dr. Witt was competent to testify under Tennessee Code Annotated section 29-26-115(a)(1). Dr. Witt was a board-certified anesthesiologist who had practiced in Lexington, Kentucky since 1980. Dr. Witt testified that he was involved with the Academic Association of Anesthesia Program Directors, which was an organization "with people from Vanderbilt, from Lexington, and the surrounding area." Dr. Witt had attended a meeting of the Southern University Department of Anesthesia Chairs at Vanderbilt in Nashville, Tennessee. Dr. Witt stated that he had been to Nashville six or seven times, that he knew the Chair at Vanderbilt's anesthesia department very well, and that he was "familiar, in a regional setting, [with] the general kinds of care offered [] in Lexington as well as in Nashville." Dr. Witt discussed several hospitals in Nashville and stated that the standard of professional care in this case "would be approximately the same as what we would see at some of the hospitals where I have been in Nashville."

Although the trial court did not have the benefit of <u>Robinson</u> or <u>Stovall</u> at the time of trial, the record reveals that Dr. Witt did not base his testimony on a national standard of care for anesthesiologists and that he did not simply equate his medical community in Lexington with a national standard of care or with the defendants' medical community in Nashville, Tennessee. <u>See</u> <u>Stovall</u>, 113 S.W.3d at 723. In sum, the trial court did not err in allowing Dr. Witt to testify and in denying the defendants' motion for a directed verdict on this basis.

*Hearsay – Medical Literature*

The defendants argue that the trial court erred in allowing the plaintiff to (a) introduce evidence indicating that medical literature supported the testimony of the plaintiff's expert witness, Dr. Witt, (b) introduce evidence that no medical literature supported the testimony of the defendants' expert witness, Dr. Eichorn, and (c) make several arguments to the jury based on existence or absence of medical literature. The defendants argue that the medical literature evidence was inadmissible hearsay and that the arguments were improper.

The plaintiff argues that no hearsay statements were read from the medical literature or used as substantive evidence and that testimony regarding the lack of medical literature was non-hearsay. Accordingly, the plaintiff also argues that no improper arguments were made to the jury in this regard.

The record reveals that the plaintiff's expert witness, Dr. Witt, was recalled to rebut the testimony of the defendants' expert witness, Dr. Eichorn. After stating that "at the concentrations used, Desflurane eliminates virtually all of the autoregulatory response," Dr. Witt responded "yes" when asked if his opinion was "supported in the medical literature." When Dr. Witt was then asked, "And, in substance, what does it say," the trial court sustained the defendants' objection. Thereafter, Dr. Witt was asked on four occasions whether "medical literature" was "consistent with" or

"supported" his testimony. Dr. Witt answered "yes" to these questions without any objection by the defendants.

The record reveals that the defendants' expert witness, Dr. Eichorn, testified that the death in this case resulted from occlusion of the carotid arteries. On cross- examination, Dr. Eichorn was asked on at least three occasions to "cite one piece of medical literature" that supported his opinion. The defendants did not object to the questions. Dr. Eichorn did not identify any specific articles.

In our view, the record does not support the defendants' argument that the trial court committed reversible error with regard to questions regarding the existence or the absence of medical literature. First, as noted above, the defendants failed to object contemporaneously to the questions asked of Dr. Witt or Dr. Eichorn. Thus, the defendants failed to preserve the issue for review on appeal. Second, even if the issue had been preserved, the record reveals that no hearsay statements were read from medical texts or medical articles and admitted as substantive evidence. See Tenn. R. Evid. 801(c). To the degree that Dr. Witt's testimony implicitly revealed the substance of the medical literature, i.e., that the medical literature was consistent with or supportive of his testimony, there was no showing that it was intended to show the truth of the matter asserted. Indeed the questions as to the presence or absence of literature were designed to elicit the basis of the experts' testimony. See McDaniel, 955 S.W.2d at 266.

Accordingly, the defendants have failed to show that the trial court committed reversible error in this regard. It follows, therefore, that the trial court did not abuse its discretion in allowing plaintiff's counsel to make references to the existence or absence of medical literature during closing argument.

*Unavailability of Defense Expert Witness*

The defendants next argue that the trial court erred in denying a motion for a mistrial or a continuance where a defense expert witness, Dr. Hays, was unavailable to testify at trial due to a sudden serious illness. The plaintiff argues that the trial court did not err in denying the motion for a mistrial or a continuance because the defendants opted not to accept the trial court's proposed alternatives.

The record establishes that during trial, the defendants told the trial court that Dr. Hays was unavailable to testify because he had been diagnosed with cancer and forced to undergo immediate treatments. The defendants argued that Dr. Hays was their "key" expert witness and that their defense would be prejudiced without his testimony because he was a "local" doctor from Nashville. The trial court offered to allow the defendants to videotape an evidentiary deposition in the courtroom pending Dr. Hays' ability to do so. The trial court also stated that it would consider whether Dr. Hays' physical condition or state of mind adversely affected the deposition. The trial court denied the defendants' motion for a mistrial or continuance finding, "[i]f he was your only expert, I think that would be a different situation."

Whether to grant a mistrial or a continuance is left to the sound discretion of the trial court. Saylor, 117 S.W.3d at 250; Blake v. Plus Mark, Inc., 952 S.W.2d 413, 415 (Tenn. 1997). Here, the trial court considered the defendants' arguments and proposed several procedures short of declaring a mistrial or continuing the trial. The trial court explored the possibility of obtaining Dr. Hays' deposition, an option the defense ultimately chose not to pursue. The trial court noted that the defendants were not left without an expert witness; to the contrary, the defense was able to present Dr. Eichorn, whom the trial court found was "a very credible witness" and a "good witness for the defense." Moreover, the trial court had already ruled that Dr. Hays' deposition was too speculative to testify on the "carotid artery occlusion" theory. Finally, the defendants' motion came after the plaintiff had already presented extensive evidence in a trial that had started some seven years after the decedent's death. Given these circumstances, the trial court did not abuse its discretion in denying the motion for a mistrial or a continuance.

*Deferred Compensation and Death Benefits*

Finally, the defendants argue that the trial court erred by allowing the plaintiff to recover the total amount awarded by the jury even though the plaintiff had received $1,003,497 as a death benefit paid by the decedent's employer. The defendants argue that the death benefits offset the amount awarded by the jury for the pecuniary value of the decedent's life. The plaintiff argues that the trial court correctly denied the defendants' motion to decrease the jury's verdict for the amount of the benefits paid by the decedent's employer.[10]

The record shows that the defendants raised this issue prior to trial by seeking to prevent the plaintiff from introducing the amount of the death benefit payment as evidence of actual economic losses. According to the deposition testimony of Gail Neuman, the head of human resources at Nissan, the decedent had worked at Nissan since 1981 and had participated in an Executive Insurance Plan. According to Ms. Neuman, the decedent deferred a certain amount of annual income with which Nissan purchased insurance. The plan provided that when a participating employee died, the employee's estate or beneficiaries were entitled to an amount equal to fifty times the annual deferred amount. Ms. Neuman testified that after taxes and adjustments for the decedent's early withdrawals, the plaintiff received $722, 517.84.

In denying the defendants' motion for a credit against the jury's verdict after trial, the trial court stated that it had considered the testimony of Ms. Neuman and had read the language in the Executive Insurance Plan. The trial court found that the decedent "made deferred income compensation to this plan, out of which he received a benefit." Moreover, the trial court found that Nissan "purchased insurance with his benefits [and whether] they gave them back to him is immaterial." Accordingly, the trial court did not credit the amount received by the plaintiff under the plan against the jury's verdict.

---

[10] The plaintiff emphasizes that the actual payment received after taxes was $722,517.84 and not $1,003,497. The plaintiff also notes that the trial court correctly granted credits and set-offs of $426,565 based on life insurance and social security benefits.

We begin our review of this issue with Tennessee Code Annotated section 29-26-119, which governs damages in a malpractice action:

> In a malpractice action in which liability is admitted or established, the damages awarded may include (in addition to other elements of damages authorized by law), actual economic losses suffered by the claimant by reason of the personal injury including, but not limited to cost of reasonable and necessary medical care, rehabilitation services, and custodial care, loss of services and loss of earned income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer . . ., by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimant or of the claimant's immediate family and insurance purchased in whole or in part, privately and individually.

(emphasis added.)

Because Tennessee Code Annotated section 29-26-119 is in derogation of the common law rule that allowed plaintiffs to recover medical expenses, whether paid by insurance or not, it must be strictly construed. Steele v. Ft. Sanders Anesthesia Group, P.C., 897 S.W.2d 270, 282 (Tenn. Ct. App. 1994). In Steele, the Court of Appeals rejected the defendant's argument that a plaintiff may not introduce evidence of medical expenses where the expenses were paid by an insurance plan purchased in part by the employee and in part by the employer. The court reasoned that the defendant's argument overlooked the statutory language that allows a plaintiff to recover medical expenses where the plaintiff has purchased insurance "in whole or in part." Id. (citing Tenn. Code Ann. § 29-26-119). In sum, the court concluded that the plain language of Tennessee Code Annotated section 29-26-119 "permits a plaintiff to introduce medical expenses when the plaintiff has paid part of the insurance premium." Steele, 897 S.W.2d at 282.

In our view, the trial court properly applied Tennessee Code Annotated section 29-26-119 in denying the defendants' motion for a credit against the jury's verdict based on the payment received by the plaintiff under the "Executive Insurance Plan." The trial court considered the language of the plan and the testimony of Nissan's head of human resources. The trial court found that the decedent had contributed to the plan and that the contributions were used in part for Nissan's purchase of insurance. Accordingly, the record supports the trial court's finding that the defendants were not entitled to a credit under the plain language of Tennessee Code Annotated section 29-26-119.

**CONCLUSION**

After carefully reviewing the record and authority, we conclude: 1) that the trial court erred in granting the plaintiff eight peremptory challenges but the error did not affect the outcome or prejudice the administration of justice, 2) that the trial court did not abuse its discretion in denying a motion for a mistrial after the plaintiff had cross-examined an expert witness with a prior statement, 3) that the trial court did not commit reversible error in allowing the plaintiff to cross-examine a defense expert witness with an alleged learned treatise, and 4) that the trial court did not abuse its discretion in excluding the deposition testimony of a defense expert witness. In addition, after reviewing the remaining issues, including those that were pretermitted by the Court of Appeals, we hold as follows: 1) that the trial court erred in remitting the jury's verdict by $1,500,000, 2) that the trial court did not abuse its discretion by denying prejudgment interest to the plaintiff, 3) that awarding damages for the loss of consortium did not violate the defendants' rights under the United States or Tennessee constitutions, 4) that the trial court did not err in finding that the plaintiff's expert witness established the professional standard of care in the community in which the defendants practiced and in denying the defendants' motion for directed verdict on this basis, 5) that the trial court did not err in allowing the plaintiff to introduce hearsay statements from medical literature or make arguments as to the presence or absence of medical literature, 6) that the trial court did not err in denying a motion for a mistrial or a continuance based on the unavailability of a defense expert witness, and 7) that the trial court did not err in refusing to allow the defendants a credit against the jury's verdict based on a payment received by the plaintiff under the decedent's executive insurance plan.

Accordingly, we reverse the Court of Appeals' judgment and reinstate the jury's verdict in favor of the plaintiff. The costs of the appeal are taxed to the defendants-appellees, Dr. Jay Michael Ura, M.D., and Nashville Anesthesia Services, for which execution shall issue if necessary.

_____
E. RILEY ANDERSON, JUSTICE