IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
DECEMBER 2, 2008 Session

## DANIEL E. GREMILLION, M.D. v. NASHVILLE GASTROINTESTINAL SPECIALISTS, INC.

Direct Appeal from the Chancery Court for Davidson County
No. 05-2801-IV     Richard H. Dinkins, Chancellor

No. M2008-00061-COA-R3-CV - Filed April 20, 2009

This appeal involves a dispute over the interpretation of a buy-out provision.  One of the four physicians in a medical practice retired and requested a repurchase of his stock.  The physicians had previously adopted a formula for the valuation of stock in such situations, but when it came time to apply the agreement, they could not agree as to the meaning of several phrases within the agreement. The trial court heard testimony regarding the parties' intentions as to the agreement and testimony from two accountants regarding their interpretations of the agreement.  After interpreting the various phrases of the agreement, the trial court valued the physician's stock and awarded prejudgment interest at the rate of ten percent since the date of the physician's retirement.  We reverse the trial court's ruling as to the meaning of the agreement and affirm the trial court's judgment as modified.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Tim K. Garrett, Justin A. Page, Nashville, TN, for Appellant

Douglas S. Johnston, Jr., Nashville, TN, for Appellee

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

On July 31, 2003, Daniel E. Gremillion, M.D., retired from Nashville Gastrointestinal Specialists, Inc. ("NGS").  Dr. Gremillion was one of four member physicians and shareholders of NGS.  In 1991, the physicians had adopted a buy-out agreement, memorialized in an "Addendum" to the minutes of their Board of Directors meeting, which provided:

> PHYSICIAN BUY-OUT.  When a partner leaves the practice his stock will be bought by the Corporation.  In lieu of other specific contractural [sic] arrangements, when a partners leaves [sic] the practice for death or other reasons and his stock is bought back, the following formula will be used;
>> The stock value will be the number obtained by taking the total accounts receivable; multiplying by 65% and dividing by the total number of stockholders; plus the number equal to the book value of the corporate assets divided by the total number of stockholders.

NGS made a partial payment to Dr. Gremillion on December 31, 2003, but the parties could not agree as to the remainder owed.

On November 10, 2005, Dr. Gremillion filed a complaint against NGS in the Davidson County Chancery Court, seeking payment for the value of his stock.  Both parties agreed that the Addendum controlled the valuation, but they disagreed as to the meaning of certain phrases within the Addendum.  The first major disagreement involved the valuation of one-fourth of 65% of the "total accounts receivable."  Dr. Gremillion contended that "total accounts receivable" should include patient accounts receivable as well as employee accounts receivable, while NGS contended that the phrase was limited to patient accounts receivable.  Next, the parties disagreed as to how to calculate the value of one-fourth of the "book value of the corporate assets."  Dr. Gremillion asserted that when computing the "book value of corporate assets," the value of all of the accounts receivable should be included as corporate assets.  However, NGS contended that the parties did not intend for patient accounts receivable to be included because they were already specifically valued in the first part of the formula.  In addition, Dr. Gremillion asserted that he was entitled to one-fourth of the book value of the company's assets, without consideration of NGS's liabilities.  NGS contended that the "book value of the corporate assets" should encompass the net value of NGS's fixed assets and liabilities.[1]  Using Dr. Gremillion's proposed interpretation of the Addendum, his stock value would be $1,064,737.  Using NGS's proposed interpretation, Dr. Gremillion's stock would be valued at $248,838.

---

[1]  On appeal, the parties do not challenge the trial court's rulings regarding whether employee accounts receivable should be included in the "total accounts receivable" and whether the accounts receivable should be counted again as part of the "book value of the corporate assets."  The only one of the three issues challenged on appeal is whether the "book value of the corporate assets" encompassed the company's liabilities.  Thus, we will not discuss in detail the evidence presented regarding the other two issues.

NGS also contended that Dr. Gremillion should be judicially estopped from claiming that NGS's liabilities could not be included in computing the "book value of the corporate assets" because, during Dr. Gremillion's divorce trial, his accountant had computed the value of Dr. Gremillion's interest in NGS, as of December 31, 1999, at $230,872 by including NGS's liabilities in his valuation.

At trial, Dr. Gremillion testified that he had no independent recollection of the physicians' discussions surrounding the adoption of the Addendum in 1991. The minutes from several meetings of the Board of Directors were introduced, which indicated that the buy-out agreement was first discussed in August of 1991. After reviewing the minutes, Dr. Gremillion testified that several options for the buy-out agreement were discussed, although he could not remember what the options were, and several issues were referred to Bill Alexander, who was NGS's in-house manager or adviser at the time. The buy-out agreement was discussed again at a subsequent meeting, and Dr. Gremillion, along with the other physicians, signed the Addendum on September 30, 1991.

Dr. Gremillion testified that, during his divorce, he had his personal accountant value several companies in which he was professionally involved. Dr. Gremillion provided his accountant's valuation of NGS to his wife's attorney and swore under oath that he had no undisclosed interest in any assets. Dr. Gremillion's accountant valued his interest in NGS at $230,872. However, Dr. Gremillion testified that he did not expect his accountant to solely rely upon the Addendum in valuing his share of NGS. He introduced a letter from his accountant, which detailed the business valuations. The accountant states in the letter that he received financial statements, leases, buy out agreements, and other historical data from the various companies, and "[a]ll information was utilized in formulation of a value for each of the respective businesses." With regard to NGS, the letter states, "[NGS] does not have a formal buy-sell agreement but has an agreement we reviewed which indicates that a terminating shareholder will receive 65 percent of total accounts receivable of all physicians divided by the number of physicians generating the services, plus the book value of the remaining assets." The accountant noted various "shortcomings" in the Addendum formula and stated that he had made various assumptions regarding each of the formula's shortcomings. The accountant never specifically stated that he was applying the Addendum to value Dr. Gremillion's share of NGS, but he used the following formula:

| | |
|---|---|
| Accounts receivable (65%) | $931,217 |
| Assets | 396,792 |
| Total liabilities | (404,520) |
| | |
| Total for division | $923,489 |
| | |
| Amount per partner | $230,872 |

On cross-examination, Dr. Gremillion conceded that his accountant did value his interest in NGS as it was reflected according to the Addendum's buy-out agreement. He also acknowledged that his

accountant used the same method of interpreting and applying the Addendum that NGS was proposing, in that both the assets and liabilities were included in the calculation.

Dr. Gremillion testified that he had already received $88,311.73 of what he was owed for his stock value. Dr. Gremillion said that he received the letter from NGS regarding its proposed valuation in accordance with the Addendum during the fall of 2005. He said NGS's valuation was prepared by Ms. Lucy Carter, who was first employed by NGS around 2002 to address special accounting issues "above and beyond" what NGS's other accountant handled "because of her expertise in health-care accounting."

Laroy William Wolff, Jr. testified on behalf of Dr. Gremillion. Mr. Wolff is a certified public accountant, accredited senior appraiser, certified valuation analyst, and certified management accountant. Dr. Gremillion had asked Mr. Wolff to determine the buy-out price of his stock by applying the Addendum formula to NGS's financial information. Mr. Wolff testified that he calculated the value of Dr. Gremillion's stock at $1,064,737 by "adopt[ing] the precise wording out of the Addendum" and applying it to the financial information. Mr. Wolff testified that, according to the plain wording of the Addendum, Dr. Gremillion was to receive one-fourth of 65% of the "total accounts receivable," which, in his opinion, would include the employee accounts receivable. Mr. Wolff also stated that determining one-fourth of the "book value of the corporate assets" should be limited to the book value of the assets of NGS – including all the accounts receivable, but no liabilities.

Mr. Wolff emphasized that when determining book value, "you have to know book value of what." He explained that there is a book value of fixed assets, a book value of accounts receivable, a book value of liabilities, a book value of equity, etc. Mr. Wolff described the Addendum formula as "very clear" and not ambiguous whatsoever. Mr. Wolff was asked whether there was "something esoteric or exotic about this term 'book value,'" and he responded, "Not to an accountant, no, sir." He testified that the "book value" of something equals its cost, less any depreciation. Mr. Wolff was asked about the importance of the remainder of the Addendum paragraph and its stated purpose of determining the value of a shareholder's stock, and he stated that those considerations were simply causing confusion in the case at bar. He said that in interpreting the formula, one should look to its clear terms rather than its purpose. On cross-examination, he was asked the following:

> Q. So when you – when you're saying you need context, the only context you need is "of the corporate assets"; you don't need the rest of the paragraph to help you?
>
> A. Absolutely not. To interpret or to calculate what that element of the formula means, absolutely not.

Mr. Wolff also testified that he did not consider who wrote the Addendum, although he conceded that he was not sure a physician would know the meaning of "book value." Mr. Wolff stated that the author of the Addendum was not important because the terms used were clear. In addition, Mr. Wolff stated that he did not consider the practical effect of his interpretation of the Addendum, that

the remaining shareholders would be left with all of the company's liabilities. He again insisted that there was no need for such considerations because he applied the Addendum "word for word." Mr. Wolff stated, "I've never seen an agreement written this way, but it is written clearly."

Mr. Wolff opined that the valuation performed by NGS's accountant, Ms. Carter, was not rendered according to the wording of the Addendum, "book value of the corporate assets," because Ms. Carter did not include patient accounts receivable but did include liabilities. Mr. Wolff claimed that Ms. Carter's valuation actually calculated "the book value of NGS," although he acknowledged that determining the book value of NGS would reflect a shareholder's equity. He stated that the book value of a business, meaning shareholder equity, would be calculated as the book value of the assets minus the book value of the liabilities. Mr. Wolff acknowledged a statement in a treatise which explained, "Net book value is the book value of the company's assets less the recorded liabilities." The treatise also stated that "net book value" is often called "book value" in the vernacular, and Mr. Wolff agreed that the terms are synonymous "when referring to the equity."[2]

Mr. Wolff also conceded that Dr. Gremillion's previous accountant, when valuing Dr. Gremillion's interest in NGS during the divorce proceedings, used a method "very similar" to that used by Ms. Carter in NGS's valuation. However, he pointed out that the previous accountant did not specifically state that he was solely relying upon the Addendum formula. Like Ms. Carter, though, Dr. Gremillion's accountant had calculated 65% of patient accounts receivable only, then excluded the patient accounts receivable from the valuation of the company's "assets," and included the company's liabilities. When asked why Dr. Gremillion's previous accountant would have included the liabilities in his valuation, Mr. Wolff responded, "[He] may have had a lot of things going on."

Ms. Lucy Carter, the accountant who prepared the valuation for NGS, also testified at trial. Ms. Carter has extensive experience representing physicians and physician practices regarding buy-sell agreements, and Dr. Gremillion, during his testimony, acknowledged that the physicians had employed her because of "her expertise in health-care accounting." In computing the value of Dr. Gremillion's stock according to the Addendum, Ms. Carter used the following calculation:

Accounts receivable as of 7/31/03 valued at 65%     $1,158,010
Book value of NGS as of 7/31/03 (excluding A/R)      (162,660)

---

[2]  The treatise reads:

> From a valuation perspective, the terms *book value* or *net book value* are merely accounting jargon. . . . As an accounting convention, the book value of a company is the historical cost of all of the company's assets – less total accumulated depreciation. Net book value is the book value of the company's assets less the recorded liabilities. Net book value (often called book value, in the vernacular) is synonymous with the amount of owners' equity recorded on the company's cost-basis balance sheet. Therefore, net book value can also be calculated as the sum of the owners' equity investments in the company plus the cumulative amount of the company's retained earnings.

Shannon Pratt, et al., *Valuing a Business – The Analysis & Appraisal of Closely Held Companies* (4th ed. 2000).

Total                                                       995,350

Stock value as of 7/31/03 (25% of total)                 $ 248,838

Ms. Carter explained that she did not include employee accounts receivable in the first part of the formula for "total accounts receivable," but she did include the employee accounts receivable in computing the "book value of the corporate assets." She also explained that she did not include patient accounts receivable in the corporate assets because they would then be counted twice. Ms. Carter was questioned about using the "book value of NGS" as follows:

Q.      . . . And why did you say "book value of NGS" as opposed to "book value of the corporate assets"?

A.      Well, I disagree with Laroy Wolff's interpretation that the Addendum is crystal clear. I think the Addendum has to be taken in whole, not just in parts. And the first three words are "the stock value will be computed as . . . ." The stock value is the equity in the practice. So my interpretation of this language, taken as a whole instead of in parts, is that you would compute the book value of the practice versus the book value of just the corporate assets.

Q.      In your view, Ms. Carter, does the beginning of the paragraph instruct as to the entire paragraph's meaning?

A.      I believe it does, yes.

Q.      And so you were trying to interpret the entire paragraph to come up with what was intended?

A.      Correct.

Ms. Carter further explained, "My interpretation of the Addendum, based on the first three words that we're computing the stock value, is that we're looking at the book value of NGS, not just the book value of – not just the corporate assets without the liabilities attached." She said that "if you're looking at computing the equity, which stock value would be the equity in the practice, then you would definitely deduct the liabilities."

Ms. Carter testified that "book value can be interpreted many different ways." She also referenced the aforementioned treatise for the notion that "there may be various ways that valuation experts will use book value, but in the vernacular, book value means the cost of the asset less depreciation, amortization and liabilities." Ms. Carter stated that she considered the vernacular meaning of the term "book value" to be appropriate here because the Addendum was drafted by a physician. She said the physicians' intention to have book value include liabilities was consistent with published materials. Ms. Carter testified that her manner of interpretation and calculation regarding the buy-out formula was also consistent with her experience in working with other physicians and buy-out formulas. She stated that "[t]ypically, when there's a formula used, there is some methodology for valuing the receivables . . . . And then added to that would be the book value of the hard assets, if you will, of the practice, which would be cash, fixed assets less depreciation,

less liabilities." Ms. Carter explained that, based on her experience representing physician practices and dealing with buy-sell agreements, it would be very unusual and, in fact, unprecedented not to include liabilities when paying out to a departing shareholder based on book value. Ms. Carter concluded by stating that the wording of the Addendum, in addition to her knowledge of buy-sell agreements in medical practices, led her to interpret the Addendum as she did. Ms. Carter testified that she was not aware of Mr. Gremillion's previous accountant's valuation when she prepared her valuation, but when she reviewed it later, she observed that she and the other accountant had used "essentially the same" method of interpreting and applying the Addendum.

Dr. Robert Herring, who had been practicing with NGS for over twenty years, testified as well. Dr. Herring testified that he wrote down the language of the Addendum at the physicians' meeting in 1991. According to Dr. Herring, the physicians discussed the Addendum for twenty to thirty minutes prior to adopting it. He said they intended to create a formula that would simplify matters when a physician departed and also provide stability for the practice. Dr. Herring testified that the physicians intended to include the value of the accounts receivable in the formula only one time, at 65%. Dr. Herring also testified that the physicians did not intend to allow a departing shareholder to take the value of assets without accounting for the liabilities. Dr. Herring stated, "I thought when I used the word 'book value' that that meant that liabilities would be included." Dr. Herring testified that Dr. Gremillion's proposed interpretation of the Addendum would pressure the other physicians to leave in order to avoid being "stuck with all the liabilities." He stated, "the last one out is a rotten egg, as he has all the liability, certainly. That was not our intent."

Another physician, Dr. Ronald Pruitt, who had been practicing with NGS for approximately eighteen years, testified about the Addendum as follows:

Q. Would you have taken pause in deciding whether to join and become a full partner had you known Dr. Gremillion took the position that the buy-out formula meant that anybody leaving took assets but no liabilities?

A. Absolutely.

Q. Why?

A. Because the company would be insolvent. I mean, if one partner cashed out and took essentially 60, 70 percent of the assets of the company, no liabilities being assigned, then it would leave 30, 40 percent for the remainder of the physicians in the group. So it would essentially bankrupt the company. It would be –

The Court: Why do you say they would take 60 or 70 percent?

A. Because, if you look at the amount, the calculation that we're looking at here that Dr. Gremillion alleges is due to him, it would take so much money out of the company, the company likely wouldn't survive, and certainly no one else could retire. Two people would put the company under water, if two people took that.

The Court: The valuation issue or –

A. That's the practical matter, that if two people retired at the same time, it

-7-

would place the company under water.

Q.  Did you have any understanding that that was at all the intent at the time the Addendum was adopted?

A.  No.  We had extensive discussions about what the intent of the buy-out was. The intent was to give a physician an exit strategy, realizing that they received considerable income as people buy into the practice. . . . So you make your money on the way in as people come in, you don't make your money also on the way out.  And there were specific discussions regarding this.  It's not to be a windfall to the guy retiring.

Bill Alexander testified that he was the consultant and practice manager for NGS when the Addendum was adopted in 1991, but he had since taken a position as administrator of another practice.  Mr. Alexander testified that he provided some guidance to the physicians regarding the buy-out formula.  He stated that the physicians' intent was to pay a retiring partner one-fourth of the accounts receivable, discounted due to collection issues, plus "the equity, the book value of the practice."  Mr. Alexander testified that there was no question in his mind that when the physicians used the term "book value," they were referring to the assets and liabilities.  He said that to interpret the phrase "book value" to mean only asset values, without liabilities, would be contrary to the parties' intent when they adopted the buy-out agreement, as well as unusual, based on his experience in dealing with buy-out agreements.

The trial court entered its final order on December 13, 2007.  Regarding the issue of judicial estoppel, the court stated, "[NGS] contends that [Dr. Gremillion] is estopped from asserting that the value of his interest in the practice is anything other than that used in the valuation he offered . . . in connection with his previous divorce proceeding, $230,872."[3]  The trial court refused to apply judicial estoppel because it concluded that Dr. Gremillion's previous accountant performed an evaluation of the business rather than applying the Addendum.

Next, the court addressed the parties' various interpretations of the Addendum.  The court began by noting, "Because the physicians drew up the Addendum themselves and were clearly involved in its evolution, language and purpose, the Court applies the maxim that equity looks to the intent rather than the form in its consideration and interpretation of the Addendum and the related issues in this case."  The trial court then stated, "It is clear to the Court that the term 'stock value' as used in the Addendum was not intended to be employed in its traditional sense or in the sense that the term would be applied to a corporation other than a professional corporation but, rather, was used by the physicians (who composed the Addendum themselves) as what they characterized as the value of their investment in the assets of the corporation as well as compensation for their work as physicians."  The court found that the parties intended to operatively define "stock value" rather than adopt or incorporate a standard definition.  The court concluded that employee accounts receivable

---

[3]  From our review of the record, we find nothing to suggest that NGS argued that Dr. Gremillion was limited to using that specific figure, $230,872.  Rather, NGS took the position that Dr. Gremillion could not interpret the Addendum formula in a manner that differed from his interpretation during the divorce proceeding.

-8-

should not be included in the determination of "total accounts receivable" and adopted Ms. Carter's calculation with regard to that portion of the formula. Next, the court concluded that accounts receivable should not be included in the "book value of the corporate assets" because the court found that the physicians did not agree to include accounts receivable twice. Finally, the trial court found that liabilities should not be included in computing the "book value of the corporate assets." The court stated, "it should be remembered that the Addendum was an effort by the physicians [to] provide for a buy-out 'if a physician should retire, die, or leave the practice for other reasons." The court then noted that the physicians could have used the terms "valuation of the corporation" or "net value of the corporate assets" if they intended to include liabilities. The court concluded by stating that "there is nothing in the record to show that, at the time of the consideration of the Addendum, the physicians contemplated that liabilities would be included in the determination of the value of the assets upon which their final payment from the corporation would be based." Therefore, the court accepted Mr. Wolff's valuation of the "book value of the corporate assets," which did not include NGS's liabilities. In sum, the trial court awarded Dr. Gremillion $569,217.75 for the value of his stock in NGS. NGS received a credit against that award for the $88,311.73 already paid to Dr. Gremillion. The trial court then awarded Dr. Gremillion interest on the award, at the rate of ten percent, since the date of his retirement on July 31, 2003. NGS timely filed a notice of appeal.

## II. ISSUES PRESENTED

On appeal, NGS presents the following issues for review, slightly restated:

1. Did the lower court err in ruling that the phrase "book value of the corporate assets" in the Addendum did not include corporate liabilities when Plaintiff had agreed that the same valuation agreement did include liabilities in his prior divorce and when the undisputed evidence at trial was that the parties to the agreement intended to include liabilities in using the phrase "book value";
2. Did the lower court err in ruling that Plaintiff was not judicially estopped and thereby could espouse before the lower court a method for calculating his "stock value" that was different from the method he used in a prior divorce proceeding;
3. Did the lower court err in assessing prejudgment interest at a rate of 10% from July 31, 2003.

For the following reasons, we reverse the trial court's ruling as to the meaning of the agreement and affirm the trial court's judgment as modified.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of issues

-9-

depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. ***Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC***, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002); *see also* ***Bryant v. Baptist Health Sys. Home Care of E. Tenn.***, 213 S.W.3d 743, 750 (Tenn. 2006). The weight, faith, and credit to be given to a witness's testimony lies, in the first instance, with the trier of fact, and the credibility accorded by the trial judge will be given great weight by the appellate court. ***Id.*** "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." ***Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. Interpreting the Addendum

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." ***Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.***, 78 S.W.3d 885, 889-90 (Tenn. 2002) (citing *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973)). When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language. ***Id.*** (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). We determine the parties' intent "by examining the four corners of the contract and the circumstances at the time of contracting." ***BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.***, 48 S.W.3d 132, 135 (Tenn. 2001) (citing *Realty Shop, Inc.*, 7 S.W.3d at 597; *Gredig v. Tenn. Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994)). "This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." ***Planters Gin Co.***, 78 S.W.3d at 890 (citing *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998)). Parol evidence is inadmissible to contradict or vary the terms of a written contract when the parties' intentions are readily ascertainable from the contract as reduced to writing. ***Gates, Duncan & Vancamp Co. v. Levatino***, 962 S.W.2d 21, 25 (Tenn. Ct. App. 1997) (citing *McQuiddy Printing Co. v. Hirsig*, 134 S.W.2d 197, 204 (Tenn. Ct. App. 1939)). However, the language of a contract, when "taken together with extrinsic facts," may lend itself to more than one reasonable inference of the intent of the parties. *See* ***Blue Diamond Coal Co. v. Holland-America Ins. Co.***, 671 S.W.2d 829, 833-34 (Tenn. 1984) (finding the term "employer" ambiguous when considering the circumstances to which the word referred). Therefore, our initial task in construing a contract is to determine whether the language of the contract is ambiguous. ***Planters Gin Co.***, 78 S.W.3d at 890. "Contractual language 'is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" ***Allstate Ins. Co. v. Watson***, 195 S.W.3d 609, 611 (Tenn. 2006) (quoting *Farmers-Peoples Bank v. Clemmer,* 519 S.W.2d 801, 805 (Tenn. 1975)).

When the words in a contract are susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Id.* If ambiguity remains after the court applies the pertinent rules of construction, the legal meaning of the contract becomes a question of fact. *Planters Gin Co.*, 78 S.W.3d at 890 (citing *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981)). "[W]hen a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co.*, 195 S.W.3d at 612.

Although the trial court did not specifically find that the Addendum was ambiguous, it stated that it was looking to the parties' intent, rather than the form of the Addendum, in interpreting it. The trial court then concluded that the parties did not intend the term "stock value" to be given its ordinary meaning, and the court also concluded that the parties did not intend the "book value of the corporate assets" to include patient accounts receivable. However, the court found "nothing in the record to show that, at the time of the consideration of the Addendum, the physicians contemplated that liabilities would be included in the determination of the value of the assets[.]"

We agree with the trial court's implicit finding that the Addendum is ambiguous. The Addendum begins by stating that it is computing "stock value." According to Ms. Carter's testimony, in order to compute "stock value," or shareholder equity, you must deduct liabilities. Mr. Wolff also testified that in order to calculate the shareholder equity, one would subtract the book value of the liabilities. However, the Addendum required a valuation of one-fourth of the "book value of the corporate assets," without specifically mentioning liabilities. Ms. Carter testified that "book value can be interpreted many different ways," and she explained that, "in the vernacular, book value means the cost of the asset less depreciation, amortization and liabilities." This Court has previously stated, "As to the accountant's definition of book value, we note that the term has different meanings depending on the context in which it is used." *Corbin v. Pendergrast*, Shelby Equity No. 13, 1990 WL 51308, at *2-3 (Tenn. Ct. App. W.S. Apr. 26, 1990) (citing 51 A.L.R.2d 606 (1957) ("The term 'book value' has no generally accepted meaning; its significance varies according to the particular definitions or stipulations under which it is to be determined.")).

As stated above, "when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co.*, 195 S.W.3d at 612. The parties do not challenge the trial court's conclusion that the physicians did not intend the term "book value of the corporate assets" to include the value of the patient accounts receivable, so we will not address the issue. However, they do challenge the trial court's conclusion that there was "nothing in the record to show that" they intended the liabilities to be included. Dr. Gremillion testified that he could not recall the physicians' discussions regarding the Addendum, but he knew that several options were discussed. Dr. Herring, on the other hand, did recall discussing the Addendum, and he testified that the physicians did not intend to allow a departing shareholder to take the value of assets without accounting for the liabilities. Dr. Herring, who wrote the Addendum, stated, "I thought when I used the word 'book value' that that meant that liabilities

-11-

would be included." Dr. Pruitt also testified that the physicians had extensive discussions "about what the intent of the buy-out was," and he said they did not intend to leave the remaining shareholders with 100% of the liabilities. NGS's former practice manager, Mr. Alexander, who was a disinterested witness, testified that there was no question in his mind that when the physicians used the term "book value," they were referring to the assets and liabilities.

We also have the valuation performed by Dr. Gremillion's own accountant during his divorce proceedings, which valued his interest in the company as of December 31, 1999, at $230,872. Although the accountant did not specifically state that he was calculating Dr. Gremillion's interest in sole reliance on the Addendum, he discussed the Addendum at length and applied, in our opinion, the same basic formula in valuing Dr. Gremillion's interest. The accountant calculated one-fourth of 65% of the accounts receivable, in addition to one-fourth of the value of the company's remaining assets minus its liabilities.

Both Ms. Carter and Mr. Wolff agreed that when computing shareholder equity, meaning, stock value, liabilities are typically included. We find no evidence in the record to support the trial court's conclusion that the physicians did not intend the term "stock value" to be employed in its traditional sense.

Considering the undisputed testimony of Dr. Herring, Dr. Pruitt, and Mr. Alexander, we find that the evidence does not support the trial court's conclusion that "there is nothing in the record to show that" the physicians intended for liabilities to be included in calculating book value. In addition to this testimony, we find it appropriate to consider the Addendum's stated purpose of calculating stock value, and the fact that the Addendum was drafted by physicians rather than accountants. Based on our review of the record, we conclude that the physicians intended that NGS's liabilities would be included in computing the value of a departing shareholder's stock. Therefore, we reverse the trial court's ruling to the contrary and modify the judgment in accordance with NGS's proposed valuation. Dr. Gremillion's stock should be valued at $248,838, and NGS should be credited for its prior payment of $88,311.73.

In light of our resolution of this issue, we need not consider the issue NGS presented regarding judicial estoppel.

### B.    *Prejudgment interest*

Next, NGS challenges the trial court's decision to award Dr. Gremillion prejudgment interest on the award, at the rate of ten percent, since the date of his retirement.

Tennessee Code Annotated section 47-14-123 provides, in relevant part:

Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum . . . .

An award of prejudgment interest is within a trial court's sound discretion. ***Hunter v. Ura***, 163 S.W.3d 686, 706 (Tenn. 2005); ***In re Estate of Ladd***, 247 S.W.3d 628, 645 (Tenn. Ct. App. 2007). The purpose of prejudgment interest is not to penalize a defendant for wrongdoing, but to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled. ***Hunter***, 163 S.W.3d at 706 (citing *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn. 1998)). "The trial court must consider whether the amount of the obligation was certain or ascertainable and whether the existence of the obligation was disputed on reasonable grounds." ***Id.*** However, these are only two of the factors to be considered when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances. ***Id.*** "The uncertainty of either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable." ***Id.*** (quoting *Myint*, 970 S.W.2d at 928). "The principle of equity is the foremost guiding consideration for a trial court when exercising its discretion to award or deny prejudgment interest." ***In re Estate of Ladd***, 247 S.W.3d at 645 (citing *Myint*, 970 S.W.2d at 927; Tenn. Code Ann. § 47-14-123). Basically, the trial court must decide whether awarding prejudgment interest is fair, given the circumstances of a case. ***Id.*** The recent trend is to favor prejudgment interest whenever awarding it "will more fully compensate plaintiffs for the loss of use of their funds." ***Id.*** (citing *Scholz v. S.B. Intern. Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000)).

> Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received. That is not to say that trial courts must grant prejudgment interest in absolutely every case. Prejudgment interest may at times be inappropriate such as (1) when the party seeking prejudgment interest has been so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight; (2) when the party seeking prejudgment interest has unreasonably delayed the proceedings after suit was filed; or (3) when the party seeking prejudgment interest has already been otherwise compensated for the lost time value of its money.

*Id.* (quoting *Scholz*, 40 S.W.3d at 83).

Again, awards of prejudgment interest are within the trial court's sound discretion. ***Hunter***, 163 S.W.3d at 706; ***In re Estate of Ladd***, 247 S.W.3d at 645. "Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court." ***In re Estate of Ladd***, 247 S.W.3d at 645 (citing *Myint*, 970 S.W.2d at 927). "However, appellate deference is not synonymous with rubber stamping a trial court's decision." ***Id.*** A trial court's discretionary decision remains subject to appellate scrutiny, albeit less strict, in that we will determine whether the trial court based its decision on applicable legal principles and whether the decision is consistent with the evidence. ***Id.***

The final order grants prejudgment interest at the rate of ten percent without elaboration. NGS contends that interest was not appropriate in this case because of the dispute as to the amount of its obligation.  NGS claims that it repeatedly offered to pay Dr. Gremillion his share value as set forth in the Addendum, but Dr. Gremillion refused to accept such payment.  In addition, NGS claims that Dr. Gremillion delayed the proceedings below because he initially disputed the effectiveness of the Addendum and did not concede that it controlled the valuation of his stock until he filed his pre-trial brief in the trial court.  Dr. Gremillion admits that he initially disputed the effect of the Addendum.  However, he claims that NGS delayed the proceedings by constantly changing its calculations and refusing to supply the necessary financial records until 2006, three years after Dr. Gremillion retired.

There is nothing in the record to support many of these assertions.  However, Dr. Gremillion testified that he did not receive NGS's final valuation of his stock, prepared by Ms. Carter, until the fall of 2005.  Ms. Carter's valuation letter is included in the record before us, but it is not dated.  Dr. Pruitt acknowledged during his testimony that there were "a number of issues" that arose prior to trial and that "all of these things contributed to my perceived delay in the process."  We cannot substitute our judgment for that of the trial court on this issue, and the record does not demonstrate that the trial court abused its discretion.  Therefore, we affirm the award of prejudgment interest.

## V.  CONCLUSION

For the aforementioned reasons, we reverse the trial court's ruling as to the meaning of the agreement and affirm the trial court's judgment as modified.  Costs of this appeal are taxed equally to the appellant, Nashville Gastrointestinal Specialists, Inc., and its surety, and to the appellee, Daniel E. Gremillion, M.D., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

-14-