# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 15, 2011 Session

## JEFF DAYTON, ET AL. v. JAMES ACKERMAN d/b/a HOME DESIGN, INC., ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 30704      Jeffrey S. Bivins, Judge**

_____

**No. M2010-00922-COA-R3-CV - Filed October 31, 2011**

_____

Sellers of a house provided the purchasers with a Limited Warranty in which different aspects of the house were warranted to be without defects for a term not to exceed one year. The purchasers testified they complained two months following the closing that the windows did not operate properly, and the sellers testified the purchasers did not complain about the windows until after more than two years. The trial court found the purchasers' testimony more credible, and based on the purchasers' expert and other evidence, concluded the installation of the windows was defective. The court awarded the purchasers damages, consisting of the replacement cost for all the windows, even though not all the windows were defective. The sellers alleged the trial court erred by excluding its expert from testifying, by determining the window installation was defective, and in the way it calculated the purchasers' damages. We affirm the trial court's judgment as modified to correct a computational error in the calculation of damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed As Modified**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, joined.

Adam O. Knight, Nashville, Tennessee, for the appellants, James Ackerman d/b/a Home Design, Inc., Home Design, Inc., and James Ackerman and wife, Laureen Ackerman, Individually.

Donald N. Capparella, Candi Renee Henry, Nashville, Tennessee, for the appellees, Jeff Dayton and wife, Kasindra Dayton.

# OPINION

This is a breach of warranty case involving issues of notice, causation, and the proper calculation of damages for improperly installed windows in a newly constructed house. The case was tried by a judge, who rendered findings of fact and rulings of law in favor of the homeowners and against the sellers. The sellers appeal, and we affirm the trial court's judgment in all respects. The trial court made a computational error in calculating the damages award, and we remand simply to correct this error.

## I. BACKGROUND

### A. LIMITED WARRANTY

Jeff and Kasindra Dayton purchased a house on August 17, 2000, from James Ackerman d/b/a Home Design, Inc., and his wife Laureen Ackerman (together, "the Ackermans"). The Ackermans operate a construction business together, and they designed and built the house the Daytons purchased. On the day of the closing, the Ackermans provided the Daytons with a Limited Warranty that included the following pertinent language:

> For a period of one year, the floor, ceilings, walls, and other internal structural components of the home that are not covered by other portions of this Limited Warranty will be free of defects in workmanship.

> . . . . .

> For a period of 60 days, the following items will be free of defects in materials or workmanship: doors (including hardware); windows; electric switches; receptacles; and fixtures; caulking around exterior openings; plumbing fixtures; and cabinet work.

> . . . . .

> As described in the Limited Warranty provided to you, which this statement of Nonwarrantable Conditions is made part of, the builder will correct defects that arise during defined time periods after construction is completed.

## B.  PROBLEMS WITH THE HOUSE

Shortly after moving into the house, the Daytons began experiencing problems, such as toilets backing up, water leaking from an upstairs bathroom through the ceiling into the downstairs area, and a malfunctioning hot water heater.  As problems arose, the Ackermans generally addressed them to the Daytons' overall satisfaction.  However, when the Daytons began experiencing problems with their windows to the extent that they were unable to latch the windows in a closed position, the Ackermans did not resolve the Daytons' concerns.  The Daytons ultimately replaced all the windows in their house and filed a complaint in June 2004 against the Ackermans, their company Home Design, Inc., and Martin Doors, Inc., the company that supplied the windows to the Ackermans.

Following preliminary investigations, the Daytons dismissed Martin Doors from their action in August 2004.  The Daytons filed an Amended Complaint in September 2004 against the Ackermans, alleging breach of contract, breach of warranty, misrepresentation, and violation of the Tennessee Consumer Protection Act.  The Daytons sought damages for, *inter alia*, replacing the windows in their house, the cost of shutters for the windows, and the cost of repairing structural defects they alleged existed in the house.[1]

Discovery between the parties proceeded, and the trial court entered an Agreed Order in February 2005 setting the case for trial on May 31, 2005.  The parties then asked the court to move the trial date to August 9, 2005, to allow additional discovery to take place.  The court agreed and entered an Agreed Scheduling Order on May 24, 2005.

Trial did not begin on August 9 as the parties anticipated, and on October 10, 2005, the Daytons filed a motion requesting permission to file a third-party complaint against Martin Doors based on the theory that if the Ackermans were found liable for the Daytons' problems with the windows, Martin Doors shared comparative fault.  The trial court denied the Daytons' motion, stating the motion was "not well taken and should be denied."

## C.  TRIAL TESTIMONY

The trial of this case occurred over several days, beginning on April 25, 2007.  Mr. and Mrs. Dayton both testified that they began experiencing problems with several of their windows in October 2000.  Mrs. Dayton testified that  she did not become aware of the problems with the windows until the fall, because up to that time she and Mr. Dayton kept the windows closed and used the air conditioning.  However, once the heat of the summer began to abate, she and Mr. Dayton began to open the windows during the days and

---

[1]The alleged structural defects are not at issue in this appeal.

experienced problems closing the windows in the evenings when the temperatures fell. Mrs. Dayton testified that she complained to Mrs. Ackerman about the windows not working properly in October 2000. Mr. Dayton testified he complained to Mr. Ackerman about the windows in the fall of 2000 as well as in the spring of 2001. Neither Mr. Dayton nor Mrs. Dayton could provide a firm date in October when they first informed the Ackermans of their problems with the windows.

Mrs. Ackerman testified she may have had a conversation with Mrs. Dayton about problems with the windows, but she did not think this occurred until at least one year after the Daytons closed on their house. Mr. Ackerman testified that the Daytons did not complain of any problems they were having with their windows until the fall of 2002. Mr. Ackerman testified that when he received the complaint about the windows, he contacted Martin Doors & Window ("Martin Doors"), the company that supplied the windows and asked Martin Doors to send a representative out to the Daytons' house to look at the windows. Mr. Ackerman explained that he assumed the Martin Doors representative took care of whatever problem the Daytons were experiencing.

A representative from Martin Doors testified that he went out to the Daytons' house to check their windows, but he could not remember what year this was. The representative testified, however, that he believed the windows were improperly installed. He explained that the frames of the windows bowed out, as if they were crimped. The representative testified that the windows were jammed into openings that were too small for them, and this was the reason for the problems the Daytons were experiencing.

Robert Warren is a licensed engineer who provided expert testimony on behalf of the Daytons. Mr. Warren testified that there was insufficient clearance between the brick veneer and the window frame which caused the windows to be kinked or crimped. He explained that the windows did not open and close properly because there was too much friction on the sides of the sashes as they slid up and down inside the tracks. When asked for his expert opinion about the cause of the Daytons' window problems, Mr. Warren responded, "First and foremost is the installation."

Gerald Bucy is a consulting engineer whom the Ackermans offered to provide expert testimony on the cause of the problems with the windows. When the Ackermans' counsel began asking Mr. Bucy what he found when he inspected the Daytons' windows in 2005, the Daytons' counsel objected on the grounds that Mr. Bucy indicated during his deposition that he had no opinion about the cause of the windows' problems. After some questions, the trial court declined to allow Mr. Bucy to testify.

After the trial, the trial court entered a Final Order incorporating a Memorandum that stated as follows:

> The threshold question on the windows claim is whether the plaintiffs gave timely notice of the problem. On this issue, the individual defendants testified that they received no notice. The plaintiffs testified that they gave oral notice through messages left with the defendants and direct communication with Mr. Ackerman.
>
> The Court finds the plaintiffs' testimony, particularly Mrs. Dayton's testimony, credible. The Court finds the plaintiffs have met the burden of showing there was sufficient notice of a warranty claim.
>
> On whether there was actually a breach of warranty from the windows, the Court considered the factual testimony of the parties, and the expert testimony of Mr. Hudson and Mr. Warren as well as exhibits, including video of the windows.[2] From the evidence, the Court finds that there was a defect with the windows that constituted a breach of the warranty. The Court also finds that, although not all of the windows were defective, that it was reasonable and necessary to replace all of them so that the windows in the house all matched, and likewise that it was reasonable and necessary to replace the blinds. The Court finds that the plaintiffs' expenses for replacement windows in the amount of $7,700 and for blinds in the amount of $4,316.20 . . . were reasonable and necessary expenses to remedy the windows' warranty breach. Accordingly, the Court awards judgment in the amount of $13,016.20 [sic].

The Ackermans filed a motion to alter or amend the Final Judgment to award them their attorneys' fees for prevailing on the structural defect claim. The trial court denied the Ackermans' motion to alter or amend, explaining that the court has discretion to award attorneys' fees and declined to do so in this case. This appeal followed.

---

[2] The Court excluded testimony about the windows from Mr. Bucy, the defendant's expert. But having reviewed the proffered testimony, the Court observes that Mr. Bucy's testimony, if admitted, would not change the findings with respect to the windows.

## II. ISSUES ON APPEAL

The Ackermans argue in this appeal that the trial court erred in the following ways: (1) by denying the Ackermans' motion to file a third-party complaint against Martin Doors; (2) by finding the Daytons provided sufficient notice to the Ackermans regarding problems with the windows; (3) by finding the windows were defective with regard to their installation, thereby constituting a breach of warranty; (4) by finding it was reasonable to replace all the windows in the house when not all windows were malfunctioning; (5) by awarding the Daytons a judgment for installing window treatments despite the fact that no window treatments existed when the Daytons purchased their house; (6) by striking Mr. Bucy's expert testimony with regard to the malfunctioning windows; and (7) by denying the Ackermans' motion to alter or amend the Final Judgment to award them their attorneys' fees under the contract because they prevailed on the claims regarding defects other than the windows.

## III. DEFENDANTS' MOTION TO FILE A THIRD-PARTY COMPLAINT

Tennessee Rule of Civil Procedure 14.01 permits a defendant to "cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." The rule provides the defendant must seek leave of the court if it seeks to file a third-party complaint more than ten days after service of the defendant's original answer.

The Ackermans did not seek leave to file a third-party complaint against Martin Doors until a year after the Daytons filed their Amended Complaint. While the initial complaint, which was filed in June 2004, listed Martin Doors as a defendant, the Daytons dismissed Martin Doors from their action in August and filed an Amended Complaint on October 11, 2004. The Ackermans filed an Answer to the Daytons' Amended Complaint in January 2005, but did not seek to add Martin Doors as a third-party defendant until nearly nine months later, on October 10, 2005.

The parties entered into an Agreed Order in February that trial would begin on May 31, 2005. The parties then signed an Agreed Scheduling Order on May 24 in which they agreed to complete all discovery by July 15, including fact witness and expert depositions, and trial was to begin August 9. On July 25 the parties held a telephone conference with the court, and the parties at that time asked for the trial to be continued because of delays caused by one of the party's experts. The Ackermans did not file their motion for leave to file a third-party complaint against Martin Doors until over two months later, on October 11, 2005. The trial court denied the Ackermans' motion seeking leave to file a third-party complaint, stating "the Motion is not well taken and should be denied."

Appellate courts review a trial court's denial of a party's motion to file a third-party complaint under an abuse of discretion standard. *Tennessee Farmers Mut. Ins. Co. v. Bradford*, 1999 WL 528835, at *7 (Tenn. Ct. App. July 23, 1999). The Tennessee Supreme Court has recently addressed the abuse of discretion standard and has stated:

> An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)). "This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, . . . the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Gonsewski v. Gonsewski*, 2011 WL 4116654, at *3 (Tenn. September 16, 2011).

The Ackermans did not seek leave from the trial court to file a third-party complaint against Martin Doors until after discovery had been completed and the case was set for trial. Considering the advanced stage of the case when the Ackermans moved for leave to file their third-party complaint and the delays the parties had already experienced setting a date for the case to be tried, we cannot conclude that the trial court's denial of the Ackermans' motion was an abuse of discretion. Accordingly, we affirm the trial court's decision denying the Ackermans' motion to file a third-party complaint.

## IV. THE TRIAL COURT'S FINDINGS OF FACTS

The Ackermans challenge the trial court's findings that the Daytons gave them sufficient notice of the problems they were experiencing with their windows and that the windows were not installed properly, causing the windows to be defective. Both Mr. and Mrs. Dayton testified they gave the Ackermans notice of the malfunctioning windows in October 2000, and both Mr. and Mrs. Ackerman testified that the Daytons did not give them notice until at least one year following their purchase of the house.

Our review on appeal of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton,* 676 S.W.2d 554, 555 (Tenn. 1984). We review a trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993). With regard to the trial court's findings on the credibility of the witnesses, the trial court is specially qualified to evaluate the credibility of witnesses because it is able to observe the demeanor of the witnesses as they testify. *Davis v. Davis*, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006), citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Accordingly, we defer to the trial court to resolve factual disputes when the credibility of the witnesses becomes an issue. *Id*.; *see Wells*, 9 S.W.3d at 783 (trial courts have most favorable position to resolve factual disputes hinging on credibility of witnesses); *ARC LifeMed. v. AMC–Tennessee,*, 183 S.W.3d 1, 24 (Tenn. Ct. App. 2005) (appellate courts will not second-guess trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Davis*, 223 S.W.3d at 238 (quoting *Wells*, 9 S.W.3d at 783 (further citations omitted)).

The Limited Warranty the Ackermans gave the Daytons at closing provided that "[f]or a period of one year, the floor, ceilings, walls, and other internal structural components of the home not covered by other portions of this Limited Warranty will be free of defects in workmanship." The warranty further provided that the windows would be "free of defects in materials or workmanship" for a period of 60 days.

In the face of conflicting testimony about when the Daytons first notified the Ackermans about their problems with the windows, we defer to the trial court's determination that Mrs. Dayton's testimony was more credible. The trial court was able to observe the demeanor of the testifying witnesses, and we are not in a position to second-guess the trial court's credibility determinations in the absence of clear and convincing evidence to the contrary. *See ARC LifeMed, Inc. v. AMC-Tennessee*, 183 S.W.3d at 25 (trial courts are in best position to determine credibility of witnesses and appellate courts will not second-guess trial court absent clear and convincing evidence suggesting otherwise). No such clear and convincing evidence to the contrary exists in this case. Accordingly, we affirm the trial court's finding that the Daytons provided sufficient notice to the Ackermans of their malfunctioning windows.

We turn next to the trial court's finding that the windows were not installed properly. The Daytons' expert, Mr. Warren, testified that there was insufficient clearance between the

brick veneer and the window frame, which caused the windows to be kinked or crimped. Mr. Warren explained that this kinking or crimping prevented some of the windows from closing as they should have. In light of the evidence before the court on this issue, we do not believe the trial court erred in finding that the windows were installed improperly. The evidence does not preponderate against that finding. Accordingly, we affirm the court's finding that the windows were improperly installed as well as its judgment that the Ackermans breached the warranty they provided to the Daytons.

## V. CALCULATION OF DAMAGES

The Ackermans next argue that since not all of the Daytons' windows were problematic, the court erred by requiring the Ackermans to reimburse the Daytons for replacing all the windows in the house. In addition, the Ackermans complain they should not be required to pay for replacement window treatments when the house was not initially sold with blinds or any other sort of window treatment.

Mr. Dayton testified that the house had twenty-seven windows and that only three sets of double windows worked properly. Mr. Dayton testified that he had all the windows in the house replaced because he was unable to match the original windows with replacement windows, and it did not look right to have mismatched windows in the house.

With regard to the window treatments, Mr. Dayton testified that he and Mrs. Dayton contacted three or four different companies to get estimates for replacing all the windows in the house. The bids they received ranged from over $30,000 down to $12,400. In an effort to save money, the Daytons decided to go with the company that offered the lowest price. When the company showed up to install the new windows, however, it became apparent that a company representative had mismeasured the window opening. As a result, the windows that were ordered were smaller than they should have been. Rather than reorder new windows, the company agreed to discount the windows by $3,700 and ultimately charged the Daytons $7,700 for the replacement windows. The Daytons purchased plantation style shutters to hide the fact that the windows were a little small for the openings. The Daytons paid $4,316.20 for these shutters. Together, the cost of the replacement windows and the shutters was nearly $400 less than the replacement windows would have cost had the company not mismeasured the window openings.

In a breach of contract suit, the purpose of awarding damages is to place the plaintiffs as nearly as possible in the position they would have occupied had the contract been performed. *BancorpSouth Bank v. Hatchel*, 223 S.W.3d 223, 228 (Tenn. Ct. App. 2006), citing *Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772, 775 (Tenn. Ct. App.1990) (further citations omitted). The plaintiffs are not entitled to profit, however, from the

defendants' breach. *BancorpSouth Bank*, 223 S.W.3d at 228; *Hennessee v. Wood Group Enters.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991). As we explained in *BancorpSouth Bank*:

> Determinations concerning the amount of damages are factually driven. Thus, the amount of damages to be awarded in a particular case is essentially a fact question. However, the choice of the proper measure of damages is a question of law to be decided by the court.

223 S.W.3d at 228, citing *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998).

The trial court determined it was reasonable and necessary to replace all the windows in the Daytons' house so that they matched and that purchasing the window treatments was reasonable to remedy the breach of the Ackermans' warranty. The windows in the Daytons' home all matched when the Daytons purchased their house, and we agree with the trial court that the Daytons are entitled to continue to have matching windows in their house. Thus, despite the fact that a few of the original windows functioned properly, the Daytons were entitled to recover the price of replacing all the windows in their house.

The Ackermans are correct in pointing out that the house initially did not have any window treatments. However, in light of the circumstances surrounding the replacement of the Daytons' windows, specifically the window company's mistake in measuring the openings for the new windows, we do not think it was unreasonable for the court to include the price of the shutters in its assessment of damages. We conclude this in large part because the price of the replacement windows and the shutters together was less than the initial agreed-upon price of the replacement windows alone, before the company ordered the wrong size windows.[3] The total damages should have been $7,700 for the windows and $4,316.20 for the shutters, for a total of $12,016.20. The trial court made a computational error and entered judgment for $13,016.20. Therefore, although we affirm the trial court's assessment of damages, we modify the judgment to correct the computational error so that amount of damages assessed against the Ackermans is $12,016.20 rather than $13,016.20.

## VI. EXCLUSION OF EXPERT TESTIMONY

The trial court did not allow the Ackermans' expert, Gerald Bucy, to give his opinion at trial about why the windows in the Daytons' home were warped. The Ackermans' assert this was error. The basis for the court's disallowance of Mr. Bucy's testimony was the Daytons' attorney's representation to the court that Mr. Bucy had identified three possible

---

[3] We may not have reached this result if the replacement windows had been the proper size and the shutters were not necessary to hide the fact that they were too small for the openings.

-10-

causes for the windows' malfunctioning during his deposition. In response to the Ackermans' attorney's questions at trial, however, Mr. Bucy started off by giving a definitive opinion about the cause of the windows' problems. The following colloquy took place during this portion of Mr. Bucy's examination:

Q: Let's start with the windows issue. What did you find when you inspected the windows at this home in May of '05?

Mr. Blankenship: Your Honor, I'm going to object to any testimony by this witness about these windows. He has testified that he has no opinion about the windows, the cause of the problem, zero opinion about it, and there's no reason to spend hours of testimony about something he has no opinion on.

Mr. Warren: Well, that's you twisting my words.

The Court: Mr. Bucy, do not be communicating back and forth.

Mr. Warren: Yes, sir.

Mr. Knight: Your Honor, if I could respond.

The Court: Yes. You may respond.

Mr. Knight: My response would be similar. I think that there's been a twisting or a mis-skewing of Mr. Bucy's testimony, and I think that he's allowed to testify on this. If Mr. Blankenship wants to cross-examine him, if that's his belief he has no opinion, then I think he'll have ample opportunity and perhaps a very powerful cross-examination. But I believe that he is able to testify to this as an expert on this matter.

The Court: Well, has he rendered an opinion on the windows previously?

Mr. Knight: He has, Your Honor. He said it could be a possibility of three different ways, three different reasons that caused this.

Mr. Blankenship: We probably should just get his deposition out and see it because, first of all, I take strong issue I'm twisting

anything.  This witness testified uncategorically that he has no opinion about what the cause is.

He then later said in his deposition, well, it could be one of three things, but he has no opinion about any of those, three things at all.  And this is - - this is - - if I'm twisting, this is a blindside to come in here today when we deposed this gentleman for hours and he has no opinion.  He said it - - I've got the notes how many times he said it in his deposition, and now he's going to be offering an opinion.

The Court:    All right. Mr. Knight, I want you to ask him - - elicit the testimony as to what his opinion is on that without going into the factual basis for it, and let's go from there.

. . . . .

Q:  (By Mr. Knight) Mr. Bucy, when you inspected the windows, were they functioning properly?

A:      Yes, they were.  There were some - - I will say that there was difficulty on - - I believe it was two of them in the master bedroom.

Q:      All right.  Well, then let's talk about those.  Do you have an opinion, Mr. Bucy, as to the cause of the difficulty in those two windows?

A:      Obviously - - there is one thing that's obvious.  The track, which is a part of the frame of those windows, was actually warped, and the bottom track kept the window from closing all the way to the stop easily.

Q:      So what is your opinion of the cause of that problem?

A:      Well, those windows are on the - -

        Mr. Blankenship:    Your Honor, I'm going to object.  He has not even answered the question if he has an opinion.

The Court:    Well, I'm letting this get on the record and then you're going to

-12-

have an opportunity, Mr. Blankenship. I want to hear this.

Q: (By Mr. Knight) Go ahead, Mr. Bucy.

A:     Would you ask the question again?

Q:     Certainly. What is the cause of the difficulty?

A:     Those windows are on the - - get southern exposure, and it is a vinyl window, and it seems to me like that about the only thing it could be would be the window warped over time. I mean, it's been five - - well, it's been a good five years since they were installed. Over five years. Probably five and a half years since they were installed. And with that exposure to the sun, it looks like they may have warped somewhat.

The Court:    All right. He's now expressed an opinion. Is that opinion that he expressed in his deposition testimony?

Mr. Knight:   Yes, Your Honor. That was one of three different possibilities.

The Court:    Well, he's not saying it's one of three possibilities now. He's saying that's a definitive issue, and that's different.

Mr. Knight:   Well, he's testified to that, Your Honor.

The Court:    I understand that. But he did not render an opinion previously that the warping was the cause of these windows; is that correct?

Mr. Knight:   Your Honor, without reading it verbatim, my recollection of the deposition testimony was that that is one of three causes, yes. That is his opinion. It could be one of three causes.

The Court:    Well, but he's testifying differently today, is he not?

Mr. Knight:   Well, Your Honor, I started down that road and he said he - - the objection came through.

The Court:    Right.

Mr. Knight:   If you want me - - I feel like I'm not able to ask him the question

-13-

that I want to ask him.

The Court: Well, you asked him what his opinion was as to why it was, and he testified it was because they were warped over time. He didn't say it could be this, it could be this, it could be this. His testimony was a definitive answer.

Mr. Knight: His testimony is what it is, Your Honor.

The Court: All right. I'm going to strike his testimony on the window issue.

Mr. Knight: Just for the record, Your Honor, the basis for that is?

The Court: The basis for that is it was an opinion which was not previously provided and, as I understand it, that the previous deposition testimony was such that he identified three possible causes and never expressed and determined an opinion as to the cause of any problems with the windows.

He has now testified to a definitive cause for that and, therefore, there was not a disclosure as to that opinion in a proper forum to the Plaintiffs prior to trial.

The Ackermans' attorney attempted to elicit from Mr. Bucy an explanation of the perceived inconsistency between his deposition testimony and his live testimony, but the court did not allow Mr. Bucy to testify any further in this regard because Mr. Bucy's trial testimony was inconsistent with his prior deposition testimony.

Rule 702 of the Tennessee Rules of Evidence governs the admission of an expert's opinion:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

In addition to Rule 702, Rule 26.02(4) of the Tennessee Rules of Civil Procedure provide the following with respect to expert testimony:

(A)(i) A party may through interrogatories require any other party to identify

each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

This rule serves the purpose of allowing opposing parties to prepare their cases by knowing in advance how an opposing expert is going to testify at trial or during a deposition. It is not uncommon for a trial court to exclude an expert's testimony when the offering party has failed to disclose the identify of the expert during discovery. *See, e.g.*, *Buckner v. Hassell*, 44 S.W.3d 78, 80-81 (Tenn. Ct. App. 2000) (court excluded expert's testimony because plaintiff had failed to disclose that physician would be offered as expert on the issue of standard of care).

Determining the admissibility of expert testimony is left to the sound discretion of the trial court, and we will not overturn the court's determination absent a showing that the court abused its discretion. *Hunter v. Ira*, 163 S.W.3d 686, 703 (Tenn. 2005); *Buckner*, 44 S.W.3d at 83. "[O]ur function is only to determine whether the trial court abused its discretion in excluding the testimony and not to substitute our view for that of the trial court." *Hunter*, 163 S.W.3d at 703; *accord Buckner*, 44 S.W.3d at 83 (appellate courts should let discretionary decision stand if reasonable minds can differ about its soundness).

This case was being tried by the court rather than by a jury. The trial court noted that it reviewed Mr. Bucy's proffered testimony, and that even if it had permitted Mr. Bucy to testify about the cause of the windows' problems, the court's ultimate conclusion would not have changed. The Ackermans failed to include Mr. Bucy's deposition transcript in the record, so we are unable to compare his deposition testimony with the testimony the Ackermans' attorney elicited at trial. Nonetheless, the Daytons' attorney stated that the witness had indicated there were three possible causes of the windows malfunctioning. We cannot conclude based on the record that the trial court abused its discretion when it excluded Mr. Bucy's trial testimony on the issue of the windows. Consequently, we hold the trial court did not err in excluding Mr. Bucy's trial testimony on the issue of the cause of the windows' problems.

## VII. THE ACKERMANS' ATTORNEYS' FEES

In their motion to alter or amend, the Ackermans requested the court to award them their attorneys' fees pursuant to the language of the parties' Contract for Sale of Real Estate.

-15-

The contract included the following provision relating to attorneys' fees:

> In the event that any party hereto shall file suit to enforce this agreement (including suits filed after closing which are based on or related to the contract), the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees as determined by the court. This provision shall survive the closing.

The court denied the Ackermans' motion, stating "the Court does not find an award of attorney's fees to Defendants under the Contract to be appropriate."

Assuming, without deciding, that the provision from the Contract for Sale of Real Estate governing attorneys' fees applies to the Daytons' claims, the Ackermans do not qualify as the prevailing party. The Daytons prevailed on the window claim, and the Ackermans prevailed on the structural claim. Thus, since each party prevailed on one of the claims, neither party is necessarily "the prevailing party." Consequently, we affirm the trial court's judgment denying the Ackermans' motion to alter or amend the final judgment.

## VIII. CONCLUSION

For the reasons stated above, we affirm the trial court's judgment with the modification described herein. Costs of this appeal shall be taxed to James Ackerman d/b/a Home Design, Inc., Home Design, Inc., and James Ackerman and wife Laureen Ackerman, Individually.

_____
PATRICIA J. COTTRELL, JUDGE

-16-